# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3266

_____

| | | |
|---|---|---|
| David Griffith, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa. |
| City of Des Moines, et al., | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted:  April 15, 2004
Filed:  October 15, 2004

_____

Before LOKEN, Chief Judge, BYE, Circuit Judge, and MAGNUSON,* District Judge.

_____

LOKEN, Chief Judge.

David Griffith, who is Hispanic, joined the Des Moines Fire Department in 1989. He commenced this action in August 2001, alleging on-going disparate treatment and retaliation by the City of Des Moines, Fire Chief Ronald Wakeham, and Assistant Fire Chief Jerry Cohoon in violation of Title VII, 42 U.S.C. § 2000e-2; 42 U.S.C. §§ 1981 and 1983; and the Iowa Human Rights Act, Iowa Code § 216.6. The

_____

*The HONORABLE PAUL A. MAGNUSON, United States District Judge for the District of Minnesota, sitting by designation.

district court[1] granted summary judgment dismissing Griffith's Third Amended Complaint. Griffith appeals. Reviewing the grant of summary judgment de novo, and viewing the summary judgment record in the light most favorable to Griffith, the nonmoving party, we affirm. See Putman v. Unity Health Sys., 348 F.3d 732, 733 (8th Cir. 2003) (standard of review).

## I. A Threshold Issue of Law.

Title VII and the Iowa Human Rights Act prohibit an employer from discriminating against an employee with respect to his compensation, terms, or conditions of employment on account of his race, color, religion, sex, or national origin. Griffith complains that he was suspended and then denied retraining, unfairly disciplined, and harassed by co-workers because of his Hispanic background.

Griffith urges us to conclude, as some district courts have concluded, that the Supreme Court in Desert Palace, Inc. v. Costa, 123 S. Ct. 2148 (2003), implicitly directed us to modify our Circuit's use of the familiar framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), at the summary judgment stage of an employment discrimination lawsuit. Griffith's brief does not explain how our summary judgment analysis must be modified. But he relies on Dunbar v. Pepsi Cola General Bottlers of Iowa, Inc., 285 F. Supp. 2d 1180, 1197 (N.D. Iowa 2003), where the court concluded that, at the summary judgment stage, the third step in the McDonnell Douglas analysis must be modified "so that it is framed in terms of whether the plaintiff can meet his or her 'ultimate burden' to prove intentional discrimination, rather than in terms of whether the plaintiff can prove 'pretext.'" We do not agree that Desert Palace affected controlling Eighth Circuit precedents in this fashion.

---

[1]The HONORABLE RONALD E. LONGSTAFF, Chief Judge of the United States District Court for the Southern District of Iowa.

Desert Palace involved the post-trial issue of when the trial court should give a "mixed motive" jury instruction under 1991 Title VII amendments codified at 42 U.S.C. §§ 2000e-2(m) and 2000e-5(g)(2)(B). The Court's opinion did not even cite McDonnell Douglas, much less discuss how those statutes impact our prior summary judgment decisions. While in general the standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, Reeves v. Sanderson Plumbing Products, Inc. 530 U.S. 133, 150 (2000), the contexts of the two inquiries are significantly different. At the summary judgment stage, the issue is whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment action. If so, the presence of additional legitimate motives will not entitle the defendant to summary judgment. Therefore, evidence of additional motives, and the question whether the presence of mixed motives defeats all or some part of plaintiff's claim, are trial issues, not summary judgment issues. Thus, Desert Palace, a decision in which the Supreme Court decided only a mixed motive jury instruction issue, is an inherently unreliable basis for district courts to begin ignoring this Circuit's controlling summary judgment precedents. For concrete evidence confirming that Desert Palace did not forecast a sea change in the Court's thinking, we need look no further than Raytheon Co. v. Hernandez, 124 S. Ct. 513, 517-18 & n.3 (2003), a post-Desert Palace decision in which the Court approved use of the McDonnell Douglas analysis at the summary judgment stage.

McDonnell Douglas and most subsequent cases in which the Supreme Court has applied McDonnell Douglas came to the Court on a trial record, not a summary judgment record. Prior to Desert Palace, in two recent cases involving the sufficiency of the plaintiff's evidence at trial, the Court held that a finding of pretext does not *compel* judgment for the plaintiff, St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993), but conversely, that the plaintiff's prima facie case combined with sufficient evidence of pretext *may* permit the jury to find unlawful discrimination, Reeves, 530 U.S. at 148. Hicks and Reeves are far more pertinent to our summary judgment analysis than Desert Palace, particularly because the Court reiterated the

principle that the McDonnell Douglas burden-shifting analysis is not the only way for a plaintiff to prove unlawful discrimination: "Proof that the defendant's explanation is unworthy of credence [i.e., pretextual] is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." Reeves, 530 U.S. at 147.

We have long recognized and followed this principle in applying McDonnell Douglas by holding that a plaintiff may survive the defendant's motion for summary judgment in one of two ways. The first is by proof of "direct evidence" of discrimination. Direct evidence in this context is not the converse of circumstantial evidence, as many seem to assume. Rather, direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 66 (8th Cir. 1997). Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part McDonnell Douglas analysis to get to the jury, regardless of whether his strong evidence is circumstantial. But if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the McDonnell Douglas analysis, including sufficient evidence of pretext. See, e.g., Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 971 (8th Cir. 1994). This formulation is entirely consistent with Desert Palace. Thus, we conclude that Desert Palace had *no* impact on prior Eighth Circuit summary judgment decisions.[2]

_____

[2]Desert Palace held that, under the 1991 amendments, if the plaintiff presents sufficient evidence of intentional discrimination solely by reason of pretext or other circumstantial evidence, and if the defendant presents sufficient evidence that it would have taken the same adverse action in any event, *either party* is entitled to a mixed-motive jury instruction. In this regard, the amendments overruled Justice

-4-

In this case, Griffith has produced no strong (direct) evidence that racial or ethnic discrimination motivated any alleged adverse employment action against him. While he presented co-worker testimony that Chief Wakeham made insensitive remarks about African American and women employees on other occasions, Griffith presented no evidence that Chief Wakeham, Assistant Chief Cohoon, or any other City decisionmaker ever uttered a single negative racial remark about Griffith's Hispanic background. Thus, the requisite causal link between remarks reflecting racial or gender bias and actions taken against Griffith is lacking. See Simmons v. OCE-USA, Inc., 174 F.3d 913, 915-16 (8th Cir. 1999). In these circumstances, Griffith must produce sufficient circumstantial evidence of illegal discrimination under the McDonnell Douglas paradigm -- by presenting a prima facie case of intentional discrimination plus sufficient evidence that one or more of the City's proffered nondiscriminatory reasons is a pretext for unlawful discrimination.

## II. The Merits.

On appeal, Griffith surrounds his specific allegations with a broad ranging attack on work conditions and employee relations in the Des Moines Fire Department. We will ignore this polemic and limit our discussion to Griffith's specific claims, stating the relevant facts as pertinent to each.

**1. Discriminatory Leave of Absence.** In December 1999, Griffith was charged with three counts of third degree sexual abuse, including one charge of

---

O'Connor's view in Price Waterhouse that a plaintiff must have "direct evidence" of a discriminatory motive to shift the burden of proof. 123 S. Ct. at 2155. The Court's resolution of that issue meant, "we need not address the second question on which we granted certiorari: 'What are the appropriate standards for lower courts to follow in making a direct evidence determination in 'mixed-motive' cases.'" 123 S. Ct. at 2155 n.3. Had the Court addressed that second question, its answer *might* have affected our cases defining direct evidence for summary judgment purposes.

abusing a minor. On the day the <u>Des Moines Register</u> published a story headlined, "Fireman Charged For Alleged Abuse," Griffith through his attorney requested an unpaid leave of absence from the Fire Department, which Chief Wakeham granted. In May 2000, Griffith pleaded guilty to lesser offenses. He was given a suspended sentence and probation on conditions that included avoiding contact with the victim. The City then allowed Griffith to return to work. On appeal, he argues that he was the victim of disparate treatment because the City did not take action for nine months when a white firefighter was charged with sex abuse in 1998. This contention is without merit. It is uncontested that Griffith requested the leave of absence.

**2. Failure To Retrain upon Griffith's Return.** When Griffith returned to work in May 2000, he believed that his firefighting skills had deteriorated during his leave of absence. He declined one or more emergency assignments, asked for additional retraining, and claims the City unlawfully discriminated in refusing his request. On appeal, Griffith argues that summary judgment was improper on this claim because training is a necessary component of his job and there is a dispute whether adequate training was provided. This contention, too, is without merit. An employer's denial of an employee's request for more training is not, without more, an adverse employment action. See <u>Woodland v. Joseph T. Ryerson & Son, Inc.</u>, 302 F.3d 839, 845 (8th Cir. 2002). Nor does the record permit a reasonable inference that Griffith's race was a factor in this training dispute.

**3. Three Disciplinary Incidents.** Griffith was disciplined three times between August 2000 and January 2002 and claims unlawful discrimination and retaliation in each instance. First, in August 2000, Chief Wakeham informed Griffith that a pre-disciplinary hearing had been scheduled because of Griffith's "abusive and argumentative" behavior in a heated exchange with Assistant Chief Cohoon over Griffith's alleged lack of training. The next day, Griffith told the Iowa Civil Rights Commission that he was the victim of discrimination and retaliation on account of his Hispanic background. The pre-disciplinary hearing took place two weeks later.

Griffith received an oral reprimand, a referral to the Employee Assistance Program (EAP) for evaluation and consultation, and additional firefighter training that he later admitted was adequate to restore his emergency firefighting skills.

On appeal, Griffith argues that a jury could find "disparate and discriminatory" treatment because a white firefighter received the same discipline -- a reprimand and referral to EAP – for more serious insubordination. The district court granted summary judgment because it is undisputed that Griffith exhibited anger and disrespect to a supervisor and there is no evidence that Wakeham acted from racial animus in imposing the discipline. After careful review of the record, we agree.

Second, in late July 2001, Des Moines arson investigators were about to interview a minor at a fire scene. Griffith asked another firefighter within the hearing of the minor's parents whether "we were allowed to question minors without a parent . . . because if it was my kid, I would want somebody there." The parents then interrupted the interview, and the arson investigators complained to Chief Wakeham. On August 16, Wakeham wrote Griffith advising him of a pre-disciplinary hearing regarding "possible interference with an official fire investigation." Six days later, Griffith filed this suit. After an August 24 pre-disciplinary hearing, Chief Wakeham issued a written reprimand and suspended Griffith without pay for one 24-hour duty shift for "conduct that disrupted an investigation of a fire of unknown origin." On appeal, Griffith argues that summary judgment is improper because whether he interfered with a fire investigation is a disputed issue of fact. The district court concluded there was no evidence that Wakeham did not believe Griffith was guilty of misconduct. Again, we agree.

Third, on October 2, 2001, Griffith failed to sign an equipment checklist. When asked to sign, Griffith stated, "I would sign the sheet if I am required to do so, but if I am not required to do so, I would prefer to not sign the sheet." The Department scheduled a pre-disciplinary hearing that day. Two days later, Griffith

complained to the City's EEO Officer that he "perceived [the incident] as discrimination and harassment." On October 23, Chief Wakeham suspended Griffith without pay for forty-eight hours for violating Fire Department policy. Griffith argues that summary judgment was improper because whether he was ordered to sign the checklist is a disputed issue of fact. Again, the district court concluded there was no evidence creating an inference that this discipline was the product of race discrimination. We agree.

Griffith further argues that the district court erred in granting summary judgment on his claims that each of these disciplines was illegal retaliation for the discrimination complaint he filed with the Iowa Civil Rights Commission, for the filing of this lawsuit, and for his letters to Chief Wakeham and to the City's Equal Employment Opportunity Officer complaining of discrimination. To establish a prima facie case of retaliation under 42 U.S.C. § 2000e-3, Griffith must show that "he engaged in protected conduct, that he suffered an adverse employment action, and that the adverse action was causally linked to the protected conduct." Putman, 348 F.3d at 737. Griffith argues that the temporal proximity between his complaints of discrimination and the disciplines is sufficient circumstantial evidence of retaliation. The district court disagreed, and so do we.

"Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir.) (en banc), cert. denied, 528 U.S. 818 (1999). In this case, Griffith lodged complaints of discrimination days *after* receiving notices of the pre-disciplinary hearings that led to the three disciplines. His post-hoc complaints did not without more raise a retaliation bar to the proposed discipline because "the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace." Kiel, 169 F.3d at 1136. Indeed, complaining of discrimination in response to a charge of workplace misconduct is an abuse of the

anti-retaliation remedy. In these circumstances, we agree with the district court that the temporal proximity between Griffith's complaints and the subsequent adverse decisions "is insufficient to allow an inference of a retaliatory motive."

**4. The Hostile Work Environment Claim.** Griffith argued in the district court and on appeal that negative co-worker comments about his Hispanic background subjected him to a hostile work environment. Griffith testified to three scattered derogatory comments by two co-workers. The comments were not directed to Griffith, and one co-worker apologized when Griffith overheard one remark. Griffith did not complain to his superiors about any of these comments. Another firefighter testified that co-workers mocked Griffith during his leave of absence and, in discussing the sexual abuse charges, said "he's getting what he deserves, and it's his own fault" and called him a "stupid Mexican." In addition to these incidents, Griffith alleges more generally that the Fire Department is a "racially tense environment" in which "racial comments and racially derogatory names" are frequent. The district court concluded that Griffith failed to show harassment pervasive or severe enough to affect a term, condition, or privilege of his employment. See, e.g., Woodland, 302 F.3d at 843. We agree. The record contains evidence that Griffith suffers from depression in large part because he perceives that his co-workers ridiculed and ostracized him as a "child molester." That is unfortunate, but discrimination on this ground is not prohibited by Title VII or by the Iowa Civil Rights Act.

Griffith asserted other claims in the district court but has not briefed them on appeal. We therefore deem those issues abandoned. See Hays v. Hoffman, 325 F.3d 982, 986 n.2 (8th Cir.), cert. denied, 124 S.Ct. 277 (2003). The judgment of the district court is affirmed.

MAGNUSON, District Judge, concurring specially.

I concur in the conclusion that Griffith's claims fail as a matter of law. However, I write separately to express my views on how Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), affects the analysis used at the summary judgment stage of an employment discrimination lawsuit.[3]  In 1991, Congress extended the protection of the Civil Rights Act, which until that point only prohibited employment decisions motivated *primarily* by an improper characteristic such as race or gender.  In amending the Civil Rights Act in 1991, Congress sought to prohibit any consideration of race or other improper characteristic, no matter how slight, in employment decisions.  Despite this clear language, courts continued to apply a test that determined whether a discriminatory motive was the necessary and sufficient cause of an employment decision, not one to determine whether a discriminatory motive played a lesser role in the employment decision.  Courts ignored the Civil Rights Act of 1991 in 1991, and they continue to ignore this congressional mandate today. Desert Palace exposes the legal fiction for what it is, and in its wake, I can no longer adhere to or apply an arbitrary and antiquated test that has been superceded by Congress.

On July 2, 1964, the Civil Rights Act of 1964 was enacted "to promote a more abiding commitment to freedom, a more constant pursuit of justice, and a deeper respect for human dignity." President Lyndon B. Johnson's Radio and Television Remarks Upon Signing the Civil Rights Bill, Pub. Papers of Lyndon B. Johnson 1963-64, vol. 2 at 842-844 (1965).  In particular, Title VII sought to "eliminate, through the utilization of formal and informal remedial procedures, discrimination in employment based on race, color, religion, or national origin." H.R. Rep. No. 88-352,

---

[3]  Because Mr. Griffith fails to present any evidence to support a claim for intentional discrimination, the Majority's discussion of Desert Palace is unnecessary.

-10-

at 26, reprinted in 1964 U.S.C.C.A.N. 2391, 2401. Congress expressly rejected the notion that Title VII liability attached only when discrimination was the sole cause of the employment action.[4] As the Supreme Court commented, "[w]hat is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." Griggs v. Duke Power Co., 401 U.S. 424, 429 (1971). Title VII imposed liability when discrimination motivated the employment decision.

In 1973, the Supreme Court adopted a tripartite analytical paradigm in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800 (1973), "to clarify the standards governing the disposition of an action challenging employment discrimination." The Court discovered that employers rarely, if ever, openly discriminated against their employees, and absent such blatant proof, an aggrieved plaintiff would lose at summary judgment. Acknowledging that Title VII "tolerates no [] discrimination, subtle or otherwise," the Court devised a burden-shifting scheme to allow a plaintiff to inferentially prove intentional discrimination. See id. at 801. Under McDonnell Douglas, the plaintiff bears the burden of proof throughout and the defendant only bears the burden of production. The plaintiff must first prove a prima

---

[4] Both the House and the Senate rejected amendments that proposed to insert the word "solely" in the text of the statute. One senator commented:

> The difficulty with this amendment is that it would render Title VII totally nugatory. If anyone ever had an action that was motivated by a single cause, he is a different kind of animal from any I know of. But beyond that difficulty, this amendment would place upon persons attempting to prove a violation of this section, no matter how clear the violation was, an obstacle so great as to make the title completely worthless.

110 Cong. Rec. 13,837-38 (1964).

facie case of discrimination, and then the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the employment decision. To determine causation, the plaintiff must prove that the single legitimate nondiscriminatory reason given by the employer is a pretext for *the* actual, discriminatory, but-for cause of the employment decision. See id. at 802-03. Absent from this opinion was any justification or authority for this scheme.[5]

---

[5] As one commentator has noted:

> The McDonnell Douglas Court gave no justification or authority for its establishment of this structure for proof of illegal discrimination. The Court did not cite or discuss any passage from Title VII or any other part of the Civil Rights Act of 1964. Nor did the Court argue that any legislative history from the Act lent support to, or even suggested, such a set of rules. The Court did not explain how proof of a prima facie case had any logical or inferential relationship to proof of the employer's intent itself. The Court did not expound upon shifting burdens of proof, presumptions, or any other procedural rules used in any other cause of action, whether statutory or common law, from which it had drawn this scheme. The Court did not cite any power a court might possess to structure the presentation of evidence in a way most conducive to accurate fact-finding. The Court's pronunciation of the prima facie case and the shift in burden to the employer stands starkly naked, without the armor of congressional support, common-law authority, or reasoning. The opinion is unanimous. No Justice bothered to concur and explain his own rationale for the holding of the case, let alone dissent from the creation, without explanation, defense, or justification, of the elements of a cause of action purportedly created by Congress. The rules laid down in McDonnell Douglas are an audacious and arbitrary exercise of power. In this way, the establishment of the structure of proof is closer to a legislative creation of policy than a judicial expression of the law under authority and reason.

Mark A. Schuman, The Politics of Presumption: St. Mary's Honor Center v. Hicks and the Burdens of Proof in Employment Discrimination Cases, 9 St. John's J. Legal

Following <u>McDonnell Douglas</u>, the Court scrambled to provide guidance to confused courts across the nation. <u>See</u>, <u>e.g.</u>, <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248 (1981). Despite the Court's efforts, courts continued to struggle with the <u>McDonnell Douglas</u> paradigm. In 1989, the Court was presented with a case in which the evidence indicated that both discriminatory and nondiscriminatory reasons contributed to the employment decision, <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989). The Court discovered that the traditional <u>McDonnell Douglas</u> scheme was ineffective to analyze such claims. Specifically, the plurality in <u>Price Waterhouse</u> concluded that Title VII's use of the words "because of" did not require plaintiffs to prove that a discriminatory motive was the but-for cause of the adverse employment decision. <u>Id.</u> at 240. Rather, the plurality held that the words "because of" obligated a plaintiff "to prove that the employer relied upon [an improper characteristic] when coming to its decision." <u>Id.</u> at 242. For cases in which a discriminatory motive affected the employment decision, the plurality further held that a defendant could escape liability when it "can prove that, even if it had not taken [an improper characteristic] into account, it would have come to the same decision regarding a particular person." <u>Id.</u> For cases in which a discriminatory motive played a less-than-decisive role in the employment decision, the <u>Price Waterhouse</u> plurality completely shifted the burden of persuasion off of plaintiffs and onto defendants, creating a defense to liability where the defendant could meet the "same decision test." <u>Id.</u> at 244-45.

Justice O'Connor, however, was uncomfortable with the notion that defendants in mixed-motive cases, or cases in which a discriminatory motive played a less-than-but-for role in an employment decision, bore the burden of proof with respect to causation. As a result, she concurred with the plurality, holding that courts should break from the <u>McDonnell Douglas</u> requirement that plaintiffs prove causation through the pretext test and instead require defendants to disprove causation through

_____

Comment. 67, 70 (1993).

the same decision test only when a plaintiff first offered direct evidence that a discriminatory motive played a substantial role in the employment action. Id. at 276 ("In my view, in order to justify shifting the burden on the issue of causation to the defendant, a disparate treatment plaintiff must show by direct evidence that an illegitimate criterion was a substantial factor in the decision.").

O'Connor described how lower courts should approach cases after Price Waterhouse, deftly distinguishing between the McDonnell Douglas framework and her Price Waterhouse framework:

> Once all the evidence has been received, the court should determine whether the McDonnell Douglas or Price Waterhouse framework properly applies to the evidence before it. If the plaintiff has failed to satisfy the Price Waterhouse threshold, the case should be decided under the principles enunciated in McDonnell Douglas and Burdine, with the plaintiff bearing the burden of persuasion on the ultimate issue whether the employment action was taken because of discrimination. In my view, such a system is both fair and workable, and it calibrates the evidentiary requirements demanded of the parties to the goals behind the statute itself.

Id. at 278-79. Price Waterhouse thus created a capricious distinction between direct and indirect evidence and single-motive and mixed-motive cases.

In 1991, Congress amended the Civil Rights Act of 1964. Congress clarified that a plaintiff establishes an unlawful employment practice when he or she "demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). The plain meaning of the statute imposes liability on an employer when an improper consideration is a motivating factor, regardless if other

factors also existed. Absent from this clear language is the requirement that discrimination be a "substantial" factor, a "but-for" factor, or the necessary and sufficient cause of the employment decision. Instead, Congress unambiguously required that discrimination be "a" motivating factor in the employment decision. Any analytical paradigm that requires greater proof to prevail on liability contradicts the express language of the statute.

Even though the language of the statute is unambiguous, legislative history reflects that Congress did not intend to require a heightened standard of evidentiary proof. Indeed, the legislative history is void of any reference to different degrees of evidentiary proof. See generally H.R. Rep. 102-40 (I) &( II), reprinted in 1991 U.S.C.C.A.N. 549.[6] Noting that Price Waterhouse "severely undercut" Title VII's comprehensive ban on "all invidious consideration" in employment, Congress clarified that Title VII imposed liability when discrimination was a "contributing" or "causative" factor in the employment decision. H.R. Rep. 102-40 (I) at 46-48. Congress did not discuss a heightened level of proof but rather intended to restore the law consistent with the legislative purpose of Title VII. Id. In addition, by making the same decision test an affirmative defense to damages but not liability, 42 U.S.C. § 2000e-5(g)(2)(B), Congress modified the motivating factor analysis originally set

---

[6] Although the legislative history addresses evidence such as conduct or statements, this reference does not indicate any intent to distinguish between direct and circumstantial evidence. Rather, Congress commented that although such evidence is relevant in an intentional discrimination claim, "mere discriminatory thoughts" alone are not actionable. Instead, conduct and remarks may be sufficient if the plaintiff can show a "nexus" between the evidence and the employment decision. H.R. Rep. 102-40 (II) at 18. Congress sought to prevent mere "thoughts" from being actionable under Title VII. As is with all evidence, there must be a causal connection to support intentional discrimination. Although the text and history of the statute do not require the plaintiff to prove proximate cause or some other heightened level of causation, the plaintiff nonetheless bears the burden to prove some degree of causation.

forth in Price Waterhouse. See H.R. Rep. 102-40 (I) at 48 ("[2000e-2(m)] would clarify that proof that an employer would have made the same employment decision in the absence of discriminatory reasons is relevant to determine not the liability for discriminatory employment practices, but only the appropriate remedy.").

The direct/indirect evidence distinction, which courts have applied since Price Waterhouse, should have fallen into disuse after Congress amended the Civil Rights Act in 1991. Nevertheless, since Price Waterhouse and despite the Civil Rights Act of 1991, courts including the Eighth Circuit have duly followed O'Connor's evidentiary distinction between the burden-shifting framework on causation in single and mixed-motive cases. For example, in Mohr v. Dustrol, Inc., 306 F.2d 636, 639 (8th Cir. 2002), the Court observed: "The framework for evaluating a Title VII discrimination claim depends on the type of evidence presented in support of the claim. Where the plaintiff relies primarily on circumstantial evidence, courts apply a tripartite analysis as set forth in McDonnell Douglas Corp. v. Green." Similarly, in Gagnon v. Sprint Corp., 284 F.3d 839, 847-48 (8th Cir. 2002), the Court made the distinction between a mixed-motive analysis under Price Waterhouse, and a single-motive analysis under McDonnell Douglas:

> Plaintiffs like Gagnon pursuing claims of discrimination under Title VII have two models under which they may proceed. First, a plaintiff can proceed under the three-stage, burden-shifting standard set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). Under this standard, Gagnon must first establish a prima facie case of discrimination. Once the prima facie case is established, the burden shifts to Sprint PCS to articulate a non-discriminatory reason for the adverse employment action. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993). If Sprint PCS articulates such a reason, Gagnon must respond with sufficient evidence that the

proffered reason was really a pretext for intentional discrimination. Id. At all times under this model, the burden of persuasion remains on Gagnon, the plaintiff. Id.

Alternatively, Gagnon can proceed under the mixed-motive standard set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989), if he is able to produce "direct evidence that an illegitimate criterion . . . 'played a motivating part in [the] employment decision.'" Cronquist v. City of Minneapolis, 237 F.3d 920, 924 (8th Cir. 2001) (alterations in original) (quoting Price Waterhouse, 490 U.S. at 258). Once Gagnon establishes such direct evidence, the burden shifts to Sprint PCS to demonstrate by a preponderance of the evidence that it would have reached the same employment decision absent any discrimination. Cronquist, 237 F.3d at 924. As modified by section 107 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e-5(g)(2), the mixed-motive model allows for declaratory relief, injunctive relief, attorney's fees and costs once Gagnon meets his initial burden regarding direct evidence. 42 U.S.C. § 2000e-5(g)(2)(B)(i).

Since Price Waterhouse, as Mohr and Gagnon illustrate, the analysis appropriate at the summary judgment stage depended on the evidentiary distinction made by Justice O'Connor.

In June 2003, the Supreme Court abrogated the proposition that whether the courts apply McDonnell Douglas or a mixed-motive analysis depends on the presentation of direct or indirect evidence. Desert Palace, 539 U.S. 98-99, 101. The Court concluded that the Civil Rights Act did not require a heightened evidentiary standard to proceed under a mixed-motive analysis. Id. Desert Palace admonished that the key issue under Title VII is whether intentional discrimination occurred, instead of how intentional discrimination is proved. Absent the distinction between direct and indirect evidence, principles of statutory interpretation compel the

-17-

conclusion that Congress never envisioned a dichotomy between single and mixed-motive cases. Congress intended to hold employers liable when discrimination was a contributing factor in the employment action, even if other motives existed. See 42 U.S.C. § 2000e-2(m); H.R. Rep. 102-40 (I) at 48; H.R. Rep. 102-40 (II) at 17. Whether a plaintiff's claim is single motive or mixed-motive is not evinced in the language or the legislative history of the statute; Title VII imposes liability when discrimination is "a motivating factor" for the adverse employment action. 42 U.S.C. § 2000e-2(m).[7]

There is no rational connection between the type of evidence presented by a plaintiff and whether a case involves single or mixed-motives. The language and legislative history of the Civil Rights Act of 1991 do not support a distinction between direct and indirect evidence. Circumstantial evidence is as equally persuasive as direct evidence in proving discrimination. Moreover, maintaining a distinction between direct and indirect evidence creates a legal fiction. Even assuming that Congress intended to create a dichotomy between single-motive and mixed-motive cases, a plaintiff that prevails under either theory obtains the same relief for a defendant's liability under Title VII. There is no need for a plaintiff to prove the more onerous single-motive case, when all that Title VII requires a plaintiff to prove is that discrimination was a motivating factor in the employment decision. 42 U.S.C. § 2000e-2(m). Courts that insist that two frameworks still exist improperly create a fictional dichotomy of "first degree discrimination" and "second degree discrimination." The plain language of the statute does not require a plaintiff to prove

---

[7] With the 1991 Amendment, it is impossible to construe the Civil Rights Act as imposing liability under §§ 2000e-2(a)(1) and 2000e-2(m) as mutually exclusive. Title VII does not create varying degrees of liability. The plain language of the statute forbids an invidious consideration from motivating, in any way, an employment decision. The 1991 Amendment was intended to clarify the statute from the improper interpretation articulated in Price Waterhouse. Section 2000e-2(m) further defines § 2000e-2(a)(1), and together these statutes form the standard for Title VII liability. Thus, the motivating factor test controls.

that discrimination was the "but-for" cause of the employment decision, but rather requires a plaintiff to demonstrate that discrimination was "a motivating" factor. There is no evidence that Congress intended to create different degrees of discrimination under Title VII.[8] Although the statute entitles a plaintiff to damages beyond that articulated in § 2000e-5(g)(2)(B), these damages are only awarded if the defendant employer fails to prove its affirmative defense that it would have made the same decision in the absence of a discriminatory motive. This burden allows the defendant employer to limit the plaintiff's remedy, but does not negate liability. Thus, whether the employer has other nondiscriminatory reasons which enter into the employment decision is wholly irrelevant to Title VII liability under the Civil Rights Act of 1991. The only rational conclusion is that no distinction between single and mixed motives exists. 42 U.S.C. § 2000e-2(m) applies to all individual disparate treatment cases.[9]

---

[8] In the absence of this evidentiary distinction, this Circuit to date has not provided any basis on which to determine whether to apply a McDonnell Douglas analysis or the alternative mixed-motive analysis. Instead, this Circuit and the Majority appear to cling to the distinction articulated in Price Waterhouse and abrogated by Desert Palace. See supra at 3-4; see Hammer v. Ashcroft, File No. 3-3259 (8th Cir. Sept. 7, 2004) ("A plaintiff who lacks direct evidence of discrimination may utilize the framework set forth in McDonnell Douglas"). The Majority misunderstands the history and context of the dichotomy between the single-motive test articulated in McDonnell Douglas and the motivating factor test, a variation of which was first adopted by the Supreme Court in Price Waterhouse. The Majority refuses to acknowledge that Desert Palace eliminated direct evidence as a prerequisite for mixed-motive analysis.

[9] Contrary to what the Majority asserts, this is not simply an issue for the purposes of giving jury instructions. Although the context of the decision applied to jury instructions, the practical effect of Desert Palace nonetheless affects the analysis used at summary judgment. The reasonable jury standard is the same as the summary judgment standard: whether the plaintiff has presented sufficient evidence from which a reasonable jury could logically infer that the adverse employment action resulted from an improper consideration of a protected characteristic.

-19-

For thirty years, courts have been slaves to the <u>McDonnell Douglas</u> burden shifting paradigm that is inconsistent with Title VII. <u>McDonnell Douglas</u> cannot be reconciled with the Civil Rights Act of 1991, as it is indignant to the clear text of the statute. <u>McDonnell Douglas</u> impermissibly focuses on the but-for cause of the employment decision, when all that the Civil Rights Act of 1991 requires is that discrimination be a motivating factor in the employment decision. Because a plaintiff need not demonstrate that discrimination was the but-for cause in the employment decision, all cases under Title VII should be evaluated to determine whether invidious discrimination in <u>any</u> <u>way</u> influenced or motivated the employment decision. <u>McDonnell Douglas</u> fails to always achieve this result, while the motivating factor test consistently does.

<u>McDonnell Douglas</u> should not be used by courts to analyze Title VII claims. The burden-shifting framework is not supported in the language of the statute, nor does it impose liability under Title VII as Congress intended. Under <u>McDonnell Douglas</u>, requiring the employer to articulate a nondiscriminatory reason for the employment decision is worthless. First, this element is not highly significant to a plaintiff's claim because in the vast majority of cases, if not all, the defendant employer always chooses to deny claims of discrimination and offers a

---

Moreover, there is no support for the proposition that the Civil Rights Act of 1991 compels different analyses at different procedural stages of a Title VII case. Applying the more onerous <u>McDonnell Douglas</u> paradigm at summary judgment and then applying the Civil Rights Act of 1991 at trial is inconsistent and impractical. This approach requires the plaintiff to prove at summary judgment that an invidious characteristic was the but-for cause of the employment action, but then at trial only requires the plaintiff to prove that this characteristic was a motivating factor in the employment decision. This inconsistency further interferes with the ultimate issue of whether there is any evidence that supports a finding that discrimination motivated the employment decision. It is absurd to require the plaintiff to satisfy a higher burden at summary judgment when the lesser burden is all that is required under the statute.

nondiscriminatory reason for the adverse employment action. Moreover, mere articulation of a nondiscriminatory reason without requiring evidentiary proof is a useless ritual. Second, even if the plaintiff successfully disproves the employer's nondiscriminatory reason, this does not necessarily result in judgment in favor of the plaintiff. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000) (prima facie case plus sufficient evidence of pretext may permit the jury to find unlawful discrimination); Hicks, 509 U.S. 502 (1993) (a finding of pretext does not compel judgment for the plaintiff; but that any reason in the record, even if not specifically articulated by the employer as the nondiscriminatory reason, is proper for jury consideration). Finally, the plain language of the statute lacks any reference whatsoever to a burden-shifting paradigm articulated in McDonnell Douglas. Instead, the Civil Rights Act of 1991 requires the plaintiff to prove that discrimination was a motivating factor, and then allows the defendant to affirmatively prove otherwise to negate damages. See 42 U.S.C. § 2000e-5(g)(2)(B). Rather than aiding the plaintiff in proving that discrimination was a motivating factor in the employment decision, McDonnell Douglas focuses on the legitimacy of the employer's proffered reasons without considering whether discrimination played any part in the adverse employment decision.

The Civil Rights Act of 1991 is intended to root out and deter employment discrimination and provide public benefit through the active enforcement of a statutory scheme that ensures equality in employment decisions. Although I acknowledge that Desert Palace confirms the demise of the McDonnell Douglas framework, I do not ignore the vitality of "pretext" – that is, the proffered reason articulated by the employer as a proxy for discrimination – and the underlying value that it provides in employment discrimination cases. Title VII liability requires a plaintiff to show that discrimination was a motivating factor in employment, using either direct or circumstantial evidence. Of course, pretext is circumstantial evidence that may sufficiently demonstrate that an employer was motivated by an improper consideration. However, § 2000e-2(m) does not require the plaintiff to prove pretext

to prevail under Title VII.  Regardless if the plaintiff proves pretext or that discrimination was a motivating factor, the plaintiff is entitled to the same damages for Title VII liability.  42 U.S.C. § 2000e-5(g)(2)(B).  A plaintiff is entitled to damages beyond those enumerated in § 2000e-5(g)(2)(B) only if the defendant employer cannot sustain its burden on its same-decision affirmative defense.  If the defendant employer cannot prove that there was an existing but-for cause that would have created the same employment result, then the plaintiff is entitled to greater damages.  Thus, a plaintiff is no worse off if he or she is unable to prove pretext.  Title VII is not designed to provide a windfall to plaintiffs, but rather serves to put the plaintiff in the same position he or she would have been in absent discrimination.  See H.R. Rep. 102-40 (II) at 19 ("complaining party may receive relief only for the harm that actually results from the illegal discriminatory conduct").  This is the fundamental purpose behind our civil litigation system.[10]

Since its inception, McDonnell Douglas has befuddled the Courts.  Over time, the Supreme Court has gradually chiseled McDonnell Douglas away from its original failing framework to an analysis that still fails to give effect to the language of the Civil Rights Act.  Since Desert Palace, courts all over this country have attempted to interpret, understand, and give effect to the Civil Rights Act of 1991.  See, e.g., Rachid v. Jack in the Box, Inc., 376 F.3d 305 (5th Cir. 2004); Dunbar v. Pepsi Cola

---

[10]  I also understand the concern that innocent defendants may be liable to plaintiffs.  However, the same-decision test ensures that no innocent defendant will owe a plaintiff damages.  This differs from McDonnell Douglas, because there are no longer guilty defendants evading liability and innocent victims denied compensation because the victims cannot successfully prove pretext.  The Civil Rights Act is designed to provide the victims of discrimination with redress and to sanction employers' discriminatory conduct.  See H.R. Rep. 102-40(I) at 47.  Requiring a plaintiff to prove pretext frustrates this objective.

General Bottlers of Iowa, Inc., 285 F. Supp. 2d 1180, 1197 (N.D. Iowa 2003).[11] However, courts have failed to thoroughly examine the language of the statute and congressional intent, and instead have fought to keep an arbitrary paradigm alive. It is imperative for courts to acknowledge a congressional mandate and give effect to the express language of the statute. There is no need to adopt a modified McDonnell Douglas approach when the Civil Rights Act of 1991 effectively allows a plaintiff to prove discrimination without invoking the complexities and insensibility of the McDonnell Douglas paradigm.[12] There is simply no need to retain the McDonnell Douglas paradigm when the Civil Rights Act of 1991 effectively allows a court to

---

[11] I am likewise cognizant that the Supreme Court acknowledged the McDonnell Douglas burden shifting paradigm following Desert Palace. See Raytheon Co. v. Hernandez, 124 S. Ct. 513, 518 n.3 (2003). In Raytheon, the Supreme Court vacated the Ninth Circuit because the panel improperly applied the disparate impact standard to a disparate treatment case. In acknowledging McDonnell Douglas, the Supreme Court stated that, "the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual." Id (emphasis added). Although the Supreme Court acknowledged McDonnell Douglas, it did not revisit the Ninth Circuit's analysis nor did it discuss McDonnell Douglas as applied to Title VII cases. Just as the Supreme Court ignored McDonnell Douglas in the Desert Palace opinion, the Supreme Court likewise ignored Desert Palace in the Raytheon opinion. These inconsistencies further demonstrate the confusion that McDonnell Douglas creates. Moreover, it is the Civil Rights Act of 1991 that overruled McDonnell Douglas, and the Supreme Court's failure to acknowledge this effect does not resurrect McDonnell Douglas.

[12] The modified McDonnell Douglas approach, as advocated in Dunbar and Rachid, essentially creates varying degrees of discrimination, by allowing a plaintiff to prove Title VII liability by either demonstrating that discrimination was (1) the "but-for" cause of the employment decision, or (2) a motivating factor in the employment decision. However, the plain language of the statute only requires the plaintiff to prove that discrimination was a motivating factor. It is ridiculous for courts to adopt a scheme that provides a plaintiff the option to prove something more than what the statute actually requires for liability.

-23-

analyze the evidence to determine if discrimination was a motivating factor in the employment decision. Thus, the Civil Rights Act of 1991sufficiently provides an analysis that achieves what Congress has always intended: the absolute elimination of discrimination in employment decisions.

As jurists, courts have the insurmountable task to interpret and apply the law as prescribed by Congress. In limited circumstances, courts have the power to invalidate congressional mandates that exceed the scope of congressional power. Nonetheless, courts do not have unfettered discretion and are not entitled to rewrite legislation as they see fit. The Civil Rights Act of 1964 and the 1991 Amendments expressly prohibit <u>any</u> discrimination in employment. Courts are not empowered to impose an arbitrary and analytical scheme that contradicts the express, unambiguous language of the statute. If Congress intended that Title VII impose varying degrees of liability, then Congress needs to amend Title VII to reflect that intent. It is simply impossible to reconcile the ancient <u>McDonnell Douglas</u> paradigm with the clear language of the Civil Rights Act. Courts are required to apply the law. <u>McDonnell Douglas</u> does not apply Title VII as Congress envisioned. In its place, the express language of the Civil Rights Act of 1991 should emerge.

Thus, courts should adhere to the statute rather than divine standards of analyzing claims. "[T]he complaining party must demonstrate that discrimination was a contributing factor in the employment decision - i.e., that discrimination actually contributed to the employer's decision with respect to the complaining party." H.R. Rep. 102-40 (II) at 18. The plaintiff may use any type of evidence to prove liability. The burden is on the plaintiff to demonstrate that discrimination was a motivating factor in the employment action. If the evidence is sufficient for a rational factfinder to conclude that discrimination was a motivating factor in the employment action, then the employer may rebut with evidence that discrimination was not a motivating factor for the employment decision. The defendant employer also bears the burden to prove that it would have made the same employment decision

-24-

absent the discriminatory motive. Judgment may be entered against either party depending on the sufficiency of the evidence presented. A plaintiff's claim will fail if the evidence is insufficient for a rational factfinder to find intentional discrimination. Eliminating the tripartite framework provides an aggrieved plaintiff with redress when the plaintiff proves that discrimination played, not the but-for role, but a role in the employment decision.

The distinction between the Civil Rights Act of 1991 and McDonnell Douglas cannot be articulated in this case. As a matter of law, regardless of what type of evidence Mr. Griffith has presented and regardless of the standard utilized by the Court, Mr. Griffith fails to present sufficient evidence to support his claim for intentional discrimination. Therefore, I concur that Mr. Griffith's claims fail, and concur in the decision to affirm the district court.

_____