# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2784

_____

| | | |
|---|---|---|
| James H. Sallis, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District |
| | * | of Minnesota. |
| University of Minnesota, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: February 14, 2005
Filed: May 20, 2005

_____

Before LOKEN, Chief Judge, RILEY, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

James Sallis appeals from a decision of the district court[1] granting summary judgment in favor of the University of Minnesota. For reversal, Sallis argues that the district court improperly dismissed his Title VII claims and that the district court abused its discretion by limiting the scope of discovery. We affirm.

_____

[1]Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

## I. *Background*

In 1993, the University of Minnesota (UM) hired James Sallis as a delivery person working in University Stores. A year or so later, UM transferred Sallis to the Parking and Transportation Building. In 2000, UM told Sallis that he would be laid off because his position as a custodian was being abolished. However, UM later rescinded the layoff notice because Sallis, as a member of the Teamsters Union, was covered by its collective bargaining agreement requiring that a worker with less seniority be laid off first. Instead, UM reassigned Sallis to UM's Fourth Street Parking Ramp under the Department of Parking and Transportation Services. After the transfer, UM placed Sallis on a third-shift work schedule based on his "clock-time" seniority.[2]

After being transferred to the 4th Street Parking Ramp, Sallis sought, but did not receive, three positions at UM. In September 2000, Sallis and four others applied for an opening as third-shift general maintenance supervisor. UM's selection process included a panel consisting of the general maintenance supervisor for the Ramp, the parking area supervisor for UM who was an African-American, and the maintenance manager asking all applicants the same interview questions. The questions were in five categories: supervisory experience; education and training; maintenance and custodial experience; familiarity with computers; and a general question category. The panel assigned a weighted numerical score in each assessment category based on the applicant's answers. The three interviewers rated Sallis 44, 51, and 56 out of a possible score of 80. UM hired the applicant who received the highest interview score with 51, 60, and 64.

---

[2]Under "clock-time" seniority, Sallis's previous seniority did not count. The Teamster's Union grieved on his behalf alleging that UM had violated Sallis's "primary-seniority" rights by assigning him to the third shift. UM Human Resources determined that the collective bargaining agreement did not require management to use the seniority system for shift-changes. It also found that the use of site-specific "clock-time" seniority was reasonable. The Teamsters Union did not seek review.

In November 2000, a third-shift maintenance and operations mechanic position opened which required some technical knowledge and skills. Sallis and another candidate were interviewed for the job. The hiring committee asked the interviewees twelve technical questions. Sallis answered two correctly, while the other candidate answered all twelve correctly. Additionally, the other candidate had 133 to 140 hours of training time and 720 hours of field experience while Sallis had only 19 hours of training time and no field experience. Lastly, Sallis applied for the position of athletic equipment worker with the UM football team but was not hired. Sallis contended the denial was based on his race.

While working at the 4th Street Parking Ramp, Sallis's direct supervisor called him "tan" in front of the maintenance manager. Sallis considered his supervisor's remark that he was a "particular person" to be a negative racial remark. Sallis also stated he heard a parking attendant talking about "niggers" and that a former worker would consistently talk about "all of the damn Somalians."

In December 2000, Sallis filed a discrimination charge with the Minnesota Department of Human Rights (MDHR) and with the Equal Employment Opportunity Commission (EEOC)[3] in which he alleged that UM's disciplinary actions, UM's failure to promote him, and other UM actions were on account of race and for reprisal. MDHR investigated and found that there was no probable cause to believe UM had discriminated against Sallis. MDHR dismissed the charge. The EEOC adopted the findings of the MDHR and closed Sallis's file.

Sallis filed a Title VII action based on racial discrimination in the United States District Court for the District of Minnesota. Sallis sought discovery from the entire UM system and UM objected. At a hearing, a magistrate judge found that Sallis's

---

[3]42 U.S.C. § 2000e-5(e)(1).

discovery requests were overly broad and unduly burdensome. The magistrate's recommended order, which the district court adopted, restricted discovery to the Department of Parking and Transportation Services.

UM moved for summary judgment, contending that Sallis had not established a prima facie case of racial discrimination for failure to promote, disparate treatment, hostile work environment or retaliation. The district court granted summary judgment in favor of UM, assuming that Sallis made a prima facie case of racial discrimination for failure to promote, but found that UM set forth legitimate, nondiscriminatory reasons for its decisions. The district court concluded that Sallis failed to show UM's reasons were pretextual. The district court also determined that Sallis failed to establish a prima facie case in each of his other claims. Sallis now appeals.

II. *Discussion*

A. *Standard of Review*

We review a district court's decision to grant summary judgment de novo. *Grey v. City of Oak Grove*, Mo., 396 F.3d 1031, 1034 (8th Cir. 2005). Fed. R. Civ. P. 56(c):

> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party must demonstrate that there are no disputed material facts. *Id*. The court must view the

-4-

evidence and all reasonable inferences in the light most favorable to the nonmoving party. *See Graves v. Arkansas Dep't of Fin. & Admin.*, 229 F.3d 721, 723 (8th Cir. 2000). The nonmoving party must show by admissible evidence that specific facts remain which create a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); *Krenik v. County of LeSueur*, 47 F.3d 953, 957 (8th Cir. 1995).

## B. *Dismissal of Sallis's Title VII Race Claim*

Sallis argues that he proffered enough evidence to defeat summary judgment and that the district court misapplied *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). Specifically, Sallis contends that the district court failed to view the facts in a light most favorable to him, but instead, "made credibility determinations and weighed the evidence." Sallis avers that paragraph 16 of his statement of facts contained undisputed facts showing that he had more supervisory experience than did the candidate who was given the third-shift supervisor position.

Title VII race discrimination cases are tested on summary judgment under either *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or in a mixed-motive case, under *Price-Waterhouse v. Hopkins*, 490 U.S. 228, 269–70 (1989) and *Desert Palace*. The district court struggled to harmonize *Desert Palace* with *McDonnell Douglas*, ultimately deciding that it "would reach the same conclusion under any conceivable reading of *Desert Palace*." We hold that *Desert Palace* is inapplicable under the facts of this case.[4]

---

[4]The Supreme Court limited *Desert Palace* to mixed-motive cases stating: "In addition, Title VII's silence with respect to the type of evidence required in mixed motive cases also suggests that we should not depart from the '[c]onventional rul[e] of civil litigation [that] generally appl[ies] in Title VII cases.' That rule requires a plaintiff to prove his case 'by a preponderance of the evidence,' using 'direct or circumstantial evidence.'" *Desert Palace*, 539 U.S. at 99. *See also Griffith v. City of Des Moines*, 387 F.3d 733, 735 (2004) (determining *Desert Palace* to be "an

In *Desert Palace* the Supreme Court held that, under Title VII of the Civil Rights Act of 1964, direct evidence of discrimination is not required in order for a plaintiff to obtain a mixed-motive jury instruction. Mixed-motive cases are those in which a plaintiff's evidence shows that an employer's decision was motivated, at least in part, by discrimination. This is not such a case. Sallis produced no convincing evidence, circumstantial or direct, that race motivated UM's decisions not to promote him. We therefore proceed under *McDonnell Douglas*.[5]

Under the burden-shifting framework of *McDonnell Douglas*, the complainant has the burden of establishing a prima facie case, "showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applications from persons of complainant's qualifications." *McDonnell Douglas*, 411 U.S. at 802.[6] The burden then shifts to the employer who must "articulate a legitimate nondiscriminatory reason for the employee's rejection." *Id.* at 802. If the employer meets this burden, the presumption of discrimination fails and the

_____

inherently unreliable basis for district courts to begin ignoring this Circuit's controlling summary judgment precedents").

[5]We have specifically declined to "modify our Circuit's use of the familiar framework established in [*McDonnell Douglas*], at the summary judgment stage of an employment discrimination lawsuit." *Griffith*, 387 F.3d at 735 (2004); *see also Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003) (using the *McDonnell Douglas* analysis in a post-*Desert Palace* decision).

[6]Sallis could have also avoided summary judgment by proof of "direct evidence" of discrimination. Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the employer's actions. *Griffith*, 387 F.3d at 736 (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997). Sallis failed to do so.

complainant must show that the employer's nondiscriminatory reason is, in reality, a pretext. *Id.* at 804. Sallis's claim fails under *McDonnell Douglas*.

The district court made no finding whether Sallis established a prima facie case of race discrimination. Instead, the court assumed arguendo that he did, and proceeded to analyze the case with the burden of production shifting to UM to show it had a legitimate nondiscriminatory reason for its hiring decisions. We agree that UM's proffered reasons for not hiring Sallis were legitimate. UM chose applicants which it deemed objectively more qualified for the positions based upon specific test results and interviews. The district court found that Sallis failed to offer evidence in response showing that UM's qualification claim was pretextual and that the actual motivating factor was race discrimination. We conclude likewise and affirm.

C. *Disparate Treatment*

Sallis also claimed disparate treatment. To establish a prima facie case of disparate treatment, Sallis must establish: (1) that he is a member of a protected class; (2) that he was qualified for his position and performed his duties adequately; and (3) that he suffered an adverse employment action under circumstances that would permit the court to infer that unlawful discrimination was involved. *Habib v. NationsBank*, 279 F.3d 563, 566 (8th Cir. 2001). An adverse employment action means "a material employment disadvantage, such as a change in salary, benefits, or responsibilities." *Tadame v. Saint Cloud State Univ.*, 328 F.3d 982, 992 (8th Cir. 2003) (citing *Bradley v. Widnall*, 232 F.3d 626, 632 (8th Cir. 2000)). "Mere inconvenience without any decrease in title, salary, or benefits is insufficient to show an adverse employment action." *Cruzan v. Special Sch. Dist. #1*, 294 F.3d 981, 984 (8th Cir. 2002).

The district court found that Sallis failed to establish a prima facie case of disparate treatment because he did not produce evidence of an adverse employment action or sufficient evidence for a reasonable inference of racial discrimination. We agree with the district court that Sallis has not shown that he suffered an adverse

employment action. An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. *Habib*, 279 F.3d at 566. Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not. *Spears v. Missouri Dept. of Corrections and Human Resources*, 210 F.3d 850, 853 (8th Cir. 2000) (citations omitted). UM did not alter Sallis's salary, benefits or responsibilities. We affirm the district court's dismissal of Sallis's disparate-treatment claim.

## D. *Hostile Work Environment*

Sallis also argues that he was subjected to a hostile work environment. To establish a prima facie case, Sallis must show that (1) he belongs to a protected group; (2) he was subject to unwelcome harassment; (3) a casual nexus exists between the harassment and the protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) his employer knew or should have known of the harassment and failed to take proper action. *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004). The environment must be both objectively hostile to a reasonable person and subjectively hostile to the victim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). We look at factors including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003); *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002).

Sallis bases his hostile work environment claim on alleged harassing conduct engaged in by UM supervisors as well as the disparate treatment he received compared to younger white employees. Sallis's evidence recounts incidents in which he was referred to by such terms as "tan," "dark," "a particular person" or "problem

employee" while white workers were treated more respectfully.[7] While rude and insensitive, the infrequency of these remarks around Sallis was not severe enough to create a hostile work environment. *See Elmahdi*, 339 F.3d at 653 (holding a hostile work environment was created when a supervisor said "boy" and "black boy" over a period of years). We find Sallis's hostile work environment claim alleged facts that, even if assumed to be true, do not rise to the level of creating an unreasonable interference with his work performance.

### E. *Retaliation*

Sallis contends that UM retaliated against him for complaining about discrimination. To demonstrate retaliation, Sallis must make a prima facie showing that: (1) he engaged in statutorily protected conduct; (2) there was an adverse employment action; and (3) a causal connection exists between his conduct and the adverse action. *EEOC v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir. 2003).

Sallis alleged that he engaged in protected activity by complaining to his supervisors, UM Human Resources Department, and through his discrimination charge with the Minnesota Department of Human Rights. These acts can indeed constitute protected activity. However, in addition to protected activity, a plaintiff must also show employer-initiated repercussions that constitute adverse employment action. Sallis did not show such an employer action. Sallis contends UM "papered" his employment and labeled him a complainer in his employment file but the facts here do not rise to the level of those recounted in *Kim v. Nash Finch, Co.*, 123 F.3d

---

[7]In his brief, Sallis indicated he overheard a co-worker use the word "nigger" and another used the phrase "damn Somalians," however, this language was not directed at Sallis and the infrequency of these remarks did not create a hostile work environment.

1046, 1066 (8th Cir. 1997).[8] We hold the district court properly granted summary judgment on his claim of retaliation.

## F. *Discovery*

Our "review of a district court's discovery rulings is 'both narrow and deferential.'" *Roberts v. Shawnee Mission Ford, Inc.*, 352 F.3d 358, 360 (8th Cir. 2003) (quoting *Moran v. Clarke*, 296 F.3d 638, 650 (8th Cir. 2002)). We will grant relief "on the basis of erroneous discovery [rulings] only where the errors 'amount to a gross abuse of discretion resulting in fundamental unfairness.'" *Id.* (quoting *Bunting v. Sea Ray, Inc.*, 99 F.3d 887, 890 (8th Cir. 1996)).

Sallis argues that it was an abuse of discretion for the district court to deny his discovery requests because all of UM's discrimination complaints were contained in an easily accessible, central database, and he experienced discrimination at the hands of other UM departments. We find this argument unconvincing.

A district court's control over discovery has been enhanced since the changes in the Federal Rules of Civil Procedure in 2000. The Rules were amended

> 'to involve the court more actively in regulating the breadth of sweeping or contentious discovery.' Fed. R. Civ. P. 26 advisory committee's notes. In particular, the new rules limit the breadth of discovery that can occur absent court approval. Under Rule 26(b)(1), for example, discovery must relate more directly to a 'claim or defense' than it did previously, and 'if there is an objection that discovery goes

---

[8]In *Kim*, there was evidence of systematic retaliation against Kim because he filed an employment discrimination charge. *Kim*, 123 F.3d at 1066. Evidence also showed that Nash Finch Co. "papered" Kim's personnel file in an attempt to discredit him. *Id.*

> beyond material relevant to the parties' claims or defenses,
> the court would become involved.'

*Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 967–68 (9th Cir. 2004); *see also Rowlin v. Alabama*, 200 F.R.D. 459, 461 (M.D. Ala. 2001) (placing limits on discovery in an employment discrimination case).

In *Onwuka v. Federal Express Corp.*, 178 F.R.D. 508 (D. Minn. 1997), the district court noted that "[t]he breadth of discovery concerning an employer's records is not unchartered waters, for the Supreme Court has acknowledged that, in Title VII cases, 'liberal civil discovery rules give plaintiffs broad access to document their claims.'" *Id.* at 516 (quoting *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 657 (1989). "Nevertheless, Courts have recognized that discovery, in the Title VII context, must be limited to the practices at issue in the case," and "[a]ccordingly, Courts have frequently tailored discovery requests, as to historic company records, to encompass a 'reasonable time period,' both before and after the discriminatory event being alleged." *Id.*

Courts have also limited the discovery of company records to the local facility where plaintiff was employed, where there is no showing of the need for regional or nationwide discovery. *See Carman v. McDonnell Douglas Corp.*, 114 F.3d 790, 792 (8th Cir. 1997) ("Companywide statistics are usually not helpful in establishing pretext in an employment discrimination case, because those who make employment decisions vary across divisions").

Sallis's discovery requests had no limitation—he sought information on every allegation of discrimination against the university—by all complainants in all departments. However, Sallis spent the last ten years working in just one UM department, Parking and Transportation Services, and his allegations of discrimination focus on the behavior of the supervisors there. The magistrate's order,

adopted by the district court, found Sallis's request to be overly broad and unduly burdensome and limited discovery to Parking and Transportation Services and to complaints filed no more than one year before the actions at issue here. The magistrate judge indicated:

> We agree with the Defendant that, to order the disclosure to the extent requested by the Plaintiff would be overbroad, and unduly burdensome, particularly in light of the fact that the discovery deadline is rapidly approaching. We are persuaded that the discovery must be limited, in both its temporal and geographical reach, so as to ameliorate the burdensomeness of the Defendant's response, but without delimiting the persuasive weight of the information so produced.

We find no abuse on the district court's part in this decision.

## III. *Conclusion*

For the foregoing reasons we affirm the decision of the district court granting summary judgment in favor of the University of Minnesota.

_____