Robert K. UNDERWOOD, Jr., Plaintiff,

v.

MONROE MANUFACTURING, L.L.C. and Richard K. Hansen, Defendants.

No. 4:03–CV–10634–RAW.

United States District Court, S.D. Iowa, Central Division.

Jan. 26, 2006.

Mark D. Sherinian, Sherinian & Walker PC, West Des Moines, IA, for Plaintiff.

Ann–Marie Holden Kendell, Danielle K. Dixon, James H. Gilliam, Brown Winick Graves Gross Baskerville Schoenebaum, Des Moines, IA, for Defendants.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ALTERS, United States Magistrate Judge.

This matter is before the Court on defendants' motion for summary judgment

[15]. This is an action brought under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1140 (Count I), the Americans with Disabilities Act (ADA), 42 U.S.C. § 12100, et seq.(Count IV), the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, et seq. (Count II), and the parallel causes of action provided by the Iowa Civil Rights Act (ICRA), Iowa Code ch. 216, et seq. (Counts III and V). The parties consented to proceed before a United States Magistrate Judge and ·the case was referred to the undersigned for all further proceedings on December 20, 2004. *See* 28 U.S.C. § 636(c). Underwood claims Monroe Manufacturing and Richard Hansen violated both federal and state law when they terminated his employment. At hearing plaintiff made an oral motion to dismiss the disability discrimination claims (Counts IV and V). That motion [35] is **granted** and Counts IV and V are dismissed. Defendants' motion challenges only the merits of plaintiff's age and ERISA claims.

## I.

### SUMMARY JUDGMENT

Defendants are entitled to summary judgment if the affidavits, pleadings, and discovery materials show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Allsup, Inc. v. Advantage 2000 Consultants, Inc.*, 428 F.3d 1135, 1138 (8th Cir.2005); *Lund v. Hennepin County*, 427 F.3d 1123, 1125 (8th Cir. 2005); *Grabovac v. Allstate Ins. Co.*, 426 F.3d 951, 955 (8th Cir.2005); *Erenberg v. Methodist Hospital*, 357 F.3d 787, 791 (8th Cir.2004); Fed.R.Civ.P. 56(c); *see Baucom v. Holiday Companies*, 428 F.3d 764, 766 (8th Cir.2005). The Court must view the facts in the light most favorable to the nonmoving party, and give that party the benefit of all reasonable inferences which can be drawn from them, "that is, those inferences which may be drawn without resorting to speculation." *Mathes v. Furniture Brands Int'l, Inc.*, 266 F.3d 884, 885–86 (8th Cir.2001) (citing *Sprenger v. Federal Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir.2001)); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Howard v. Columbia Public Schl. Dist.*, 363 F.3d 797, 800 (8th Cir.2004)("unreasonable inferences or sheer speculation" not accepted as fact); *Erenberg*, 357 F.3d at 791. An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (citing *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A genuine issue of fact is material if it "might affect the outcome of the suit under governing law." *Hartnagel*, 953 F.2d at 395 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see Hitt v. Harsco Corp.*, 356 F.3d 920, 923 (8th Cir.2004); *Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir.1999); *cf. Johnson v. University of Iowa, St. Bd. of Regents*, 431 F.3d 325, 328 (8th Cir.2005)("Summary judgment is still appropriate ... when the disputed facts will not affect the outcome of the suit"); *Baucom*, 428 F.3d at 766 ("There is no genuine issue of material fact if the evidence is such that a reasonable jury could not return a verdict for [plaintiff]").

It is the non-moving party's obligation to "go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact." *Rouse*, 193 F.3d at 939; *see Grabovac*, 426 F.3d at 955 (non-moving party cannot "simply rest upon the pleadings," quoting *Jeseritz v. Potter*, 282 F.3d 542, 545 (8th Cir.2002)); *Baucom*, 428 F.3d at 766 (plaintiff may not relay on "mere allegations"); *Hitt*, 356 F.3d at 923. "We

consider only admissible evidence and disregard portions of various affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions as fact." *Howard,* 363 F.3d at 801. In assessing a motion for summary judgment a court must determine whether a fairminded trier of fact could reasonably find for the non-moving party based on the evidence presented. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Herring v. Canada Life Assurance Co.,* 207 F.3d 1026, 1030 (8th Cir. 2000).

## II.

### FACTUAL BACKGROUND

Defendant Monroe Manufacturing, L.L.C. (hereinafter "Monroe") is an Iowa limited liability company with its principal place of business in Colfax, Iowa. Monroe manufactures tables for the rental/convention industry, and for churches and schools. The plant had two production areas: one was the "metal" area and the other the "wood" area.

Plaintiff Robert Underwood began his employment with the company in August 1963 in the metal area. (Def.App. at 3). He initially started on the floor working with the riveting machine and drilling holes. In approximately 1964, Underwood became a welder in the metal area and in 1970 began supervising the metal department. (*Id.* at 4–7). Bill Coville, the plant manager and a former owner, was Underwood's immediate supervisor at all times relevant to this lawsuit. (*Id.* at 8, 12–13, 49–50).

In July 2000 Monroe's sales began to drop. (Def.App. at 59–61). In February 2001 the company initiated a round of layoffs, laying off everyone in the company except for the sales force and two production supervisors, Underwood and Steve West (who was in charge of the wood side of the plant), in an attempt to rebuild the company's order list. (*Id.*) Approximately three months later the company began recalling employees on a limited basis, based on the business needs of the company and the seniority of the employees. (*Id.*) In the summer of 2001 the company had a second round of layoffs, as the company's sales had again fallen off. (*Id.*) At this point, the company reduced the wages of all salaried employees. (Id. at 62, 75). Following 9/11, sales declined further.[1] (Id. at 50, 59–61, 28, 32–33).

Defendant Richard Hansen and an individual named David DeWaard purchased the company from its secured creditors in October 2002 and owned it until approximately February 2004. (Def.App. at 11, 27, 49). Hansen owned 90 percent of the company; Dewaard 10 percent. (*Id.* at 27). When they purchased the company, Monroe had lost its group health insurance benefits. (*Id.* at 34–35, 56). In an October 2002 conversation with Carol Swift, a sales manager at the company, Hansen explained the increased cost of the new group health insurance benefits he had been able to secure. Hansen had been told by the insurance companies that Monroe's workforce had "bad demographics" which Hansen explained more simply to Swift as meaning Monroe had "some" or "a lot" (the record varies) of "old, sick people." (*Id.* at 38, 74).

Hansen made other statements which Underwood contends show animosity on Hansen's part to older workers. Though the statements allegedly made by Mr. Hansen and the context are disputed, the Court takes Underwood's version as true

---

1. Plaintiff denied this assertion, but pointed to no evidence in the summary judgment record which would support that denial. *See* LR 56.1.b ("[F]ailure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact.")

for the purposes of summary judgment. At a meeting to explain the company's new health insurance Hansen asked Underwood why he was not on his wife's insurance policy. (Pl.App.91). A couple of years earlier Underwood had told Coville he was thinking of retiring at age 62. After Hansen arrived he asked Underwood if that was true. Underwood responded "no" because he had since been advised by Coville that the company's pension plan had not been funded for three years. (*Id.* at 87–88). By affidavit, former Monroe employee Clarence Bair has said that at some point while he and Hansen were walking through the plant together, Hansen looked around at the workers and "made an off-hand comment to the effect that he would rather have younger people working there than older people ... younger people could do more, better and quicker and ... old people can't keep up." (*Id.* at 1).

Hansen spent two or three days a week at the plant, occasionally walking through the factory area. (Def.App. at 12, 37). Coville oversaw the day-to-day operations of the factory; Hansen controlled disbursements of funds. (Pl.App. at 12). Coville described Hansen's management style as "abrupt" and "opinionated," though he said Hansen did not force him to make decisions he did not want to make. (*Id.* at 13). From the beginning of Hansen's tenure Monroe was in a "turn-around situation" in which costs had to be cut. (*Id.* at 12–13). One area on which Hansen and Coville disagreed and had heated discussions was the size of the workforce. (*Id.* at 13). According to Coville, Hansen "felt he had too large of a labor force and there was always pressure to trim back on that."

(*Id.* at 14). Nonetheless, Hansen had agreed that for a period of time after he acquired the company Coville would be allowed to retain the existing workforce until it was apparent in what direction the company was heading. (*Id.* at 16).

In February 2003 Monroe attended the annual National Rental Association show in Anaheim, California, posting the worst sales in the company's history. Typically the company's sales reached $900,000 at this show, but in February 2003 its sales were only $75,000. (Def.App. at 32–33).[2] Monroe's rental business approximated 30 to 40 percent of its business and after the February 2003 show, sales continued to decline.[3] (*Id.* at 32–33, 57–58).

Concluding the company needed to further reduce or eliminate expenses, in late March 2003 management (Hansen, Dewaard and Coville) looked at the company's operation expenses to determine where cuts could be made or costs reduced.[4] (Def.App.28, 33, 34–35, 47, 53–55, 57–58, 64). The labor payroll cost was one of the company's most significant expenses. (*Id.* at 36, 44–45, 54–55, 63–64). The company was at the point it had no choice but to reduce the workforce. (Pl. App. at 13). After consulting with Coville and Dewaard, Hansen directed Coville to make recommendations concerning positions which could be downsized. (Def.App. at 28–30, 53, 64–65). Coville prepared a list containing names, salaries and annualized salaries of possible employees and positions to be downsized and presented it to Hansen. (*Id.* at 28–30, 41, 65, 72).[5] Sometime in late March 2003 Coville, Hansen (and maybe Dewaard) discussed the names on the list and determined that with only

---

**2.** Plaintiff's response to this statement of fact was qualified with an assertion that no substantiating financial documents had been produced as requested. However, no evidence impeaches the cited testimony on the subject.

**3.** *See* footnote 1 *supra.*

**4.** *See* footnote 1 *supra.*

**5.** Plaintiff made a response of "qualified" to this statement of fact, stating that no such list has been produced. *See* footnote 2 *supra.*

22 employees working in the plant, with each area supervisor managing eleven people, the retention of two production supervisors could no longer be justified. (*Id.* at 29, 30).

Coville analyzed the duties of the two production supervisor positions and the qualifications of Underwood, age 61, and West, age 40. (Def.App. at 29–31, 70). Underwood had worked for Monroe, or its predecessor Monroe Table, for 40 years, primarily in the metal department. He helped out in the wood area from time to time, but was unfamiliar with the basics of wood assembly. He was unfamiliar with the operation of new computerized equipment including panel saws and other power equipment unique to the woodworking aspects of Monroe. (*Id.* at 3–7, 9–10, 30–31, 69–70). On at least two occasions during meetings, Underwood stated "I don't know nothin' about wood." (*Id.* at 31). Underwood has admitted West had more experience in the wood area of the company. (*Id.* at 20). West had worked at Monroe for over 21 years, working nine years in the metal department and over twelve years in the wood department. He had experience in welding, riveting, painting and pipe bending (metal applications) as well as his experience managing the wood area. (*Id.* at 19, 31–31, 77–78, 70).

Coville recommended that Underwood's position be eliminated because his duties could be redistributed and combined with West's duties more effectively and efficiently since West had experience working in both areas of the plant and Underwood had experience only in the metal area. (Def.App. at 30–31, 70). Hansen approved the recommendation. (*Id.* at 64). Underwood was terminated on April 9, 2003. (Def.App. at 13). Both Coville and Hansen agreed Underwood was a good employee and that his layoff had nothing to do with performance. (*Id.* at 30, 62; Pl.App. at 30, 31).

At the time he was laid off, Underwood was one of the highest paid employees; West was the second highest. (Def.App. at 15, 63). Underwood received a severance package as part of his termination and payment for his 401K retirement plan and is receiving reduced payments under his pension plan. (*Id.* at 66, 23, 24, 25). West continues to be employed by Monroe, serving as the only plant supervisor, overseeing both the wood and metal areas. (Def.App. at 80).

Underwood was aware of the company's financial problems and that others were being laid off. (Def.App. at 14–16). Other areas of the company were also downsized, either by attrition or layoff. (*Id.* at 16–17, 39–42, 64–70, 71). At least five other employees were laid off at approximately the same time as Underwood and five quit. (*Id.* at 65). The others who were laid off included Mark Stanley, sales manager, age 34; Jim Pearson, wood worker, age 42; Dave Bortz, wood worker, age 64; Gary Phelps, wood worker, age 47; Chris Smith, wood worker, age 37. David McNeeley, office employee, age 67, had his hours cut back to 24 hours/week. (Id. at 16–17, 64–70, 71; Pl.App. at 44). Employees who quit in the same time frame or shortly afterward included Carol Swift, customer service/orders, age 43; Venita Kendall, metal department, age 30; David Olson, metal department, age 28; Robin Brenner, age 42; and Clarence Bair, age 57. (*Id.* at 68–69, 81; Pl.App. at 19–20). Two workers were called back later: Pearson and Smith; McNeeley's hours were partially restored.[6] (Pl.App. at 18, 20).[7] By the

---

**6.** When Coville told McNeeley his hours would be restored, McNeeley asked that they only be partially restored for personal reasons. (Pl.App. at 45).

**7.** See footnote 1 *supra*.

Court's count, of the 38 employees who remained employed on April 30, 2003, approximately 30 were age 40 or older; 15 were age 50 or older; and 4 were age 60 or older.[8] (Def.App. at 81).

For some period of time prior to the layoffs, Underwood had been having blood in his urine. (Pl.App. at 21). There are factual disputes concerning what Hansen and Coville knew about Underwood's condition and when they knew it, but Coville knew Underwood was having problems with his bladder for several months before he was terminated and Underwood has testified he told Hansen he had to have surgery to remove a tumor on the Friday before he was terminated (April 5, 2003) and he might miss one or two days of work. (Def.App. at 21–22). Underwood also testified he gave the same news to Coville the day before he was terminated, Monday, April 8, 2003. (*Id.* at 22). Neither Hansen or Coville made any response to Underwood's news. (*Id.*) Hansen testified that Underwood told him he was going in for a medical test and that he would see Hansen Monday. Hansen did not know what it was for and knew nothing about a tumor on Underwood's bladder which required surgery. (Pl.App. at 36). Hansen

further testified the decision to lay off Underwood was made sometime in March 2003, but the lay off was not implemented for a week or two later. (Def.App. at 40). Coville thought he presented the list of people to be laid off to Hansen about a few days to a week before the layoffs were executed. (*Id.* at 21).

This lawsuit was filed November 14, 2003, after the Iowa Civil Rights Commission issued an Administrative Release and the Equal Employment Opportunity Commission a Notice of Right to Sue.

## III.

## Discussion

### A. *Age Discrimination* [9]

■■■ The ADEA prohibits employment discrimination on the basis of age. 29 U.S.C. § 623(a)(1). As with other claims of discrimination, courts analyze age discrimination cases under one of two analytical frameworks; the *Price–Waterhouse*[10] direct evidence analytical framework or the *McDonnell Douglas*[11] indirect evidence, burden-shifting analytical framework. *See Lee v. Rheem*, 432 F.3d 849 (8th Cir.2005); *Kells v. Sinclair Buick–*

---

**8.** The list of employees in defendants' appendix is not verified, but Underwood provides no reason to doubt its accuracy.

**9.** ICRA age discrimination cases are in general analyzed under the same framework as the ADEA. *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 919 n. 2 (8th Cir.2000); *Bialas v. Greyhound*, 59 F.3d 759, 762–63 (8th Cir. 1995); *Landals v. George A. Rolfes Co.*, 454 N.W.2d 891, 893–94 (Iowa 1990).

There is a substantive difference between Iowa and federal law on the subject of age discrimination. Iowa's age discrimination law is "age-neutral" in that it "prohibits discrimination in employment 'because of age'" with certain exceptions not relevant in this case. *Kunzman v. Enron Corp.*, 902 F.Supp. 882, 902 (N.D.Iowa 1995); *compare* Iowa § 216.6(a) *with* 29 U.S.C. § 623(a)(1), 631(a).

The first element of an ADEA prima facie case is thus not required by ICRA, but this difference is not important here as Underwood was over 40.

**10.** 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Under *Price Waterhouse*, if plaintiff produces direct evidence of age discrimination, the burden shifts to the employer to prove "it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor." *Id.* at 276, 109 S.Ct. 1775 (O'Connor, J., concurring). *See Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045–46 (8th Cir.2005); *EEOC v. Liberal R–II School Dist.*, 314 F.3d 920, 922 (8th Cir.2002).

**11.** 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1974).

*GMC Truck, Inc.*, 210 F.3d 827, 835 (8th Cir.2000); *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir.1999). As the Court sees it, summary judgment on the age claims turns on whether Underwood has produced direct evidence of age discrimination. Absent such evidence, the circumstances would not give rise to an inference of age discrimination under the *McDonnell Douglas* analysis because the legitimate non-discriminatory reason offered for the discharge decision—a reduction in force and West was more qualified by experience for the combined supervisory position over the wood and metal areas—has not been countered by evidence sufficient to infer the reason given was a pretext for age discrimination.

■■ Underwood points to three statements by Hansen as directly evincing a discriminatory animus toward older workers: (1) the statement to Carol Swift that Monroe's workforce was populated by "old, sick people;" (2) the statement to Bair that Hansen would rather have younger people working for Monroe accompanied by his stated belief that younger people could do more, quicker and better and old people could not keep up; and (3) Hansen's question to Underwood asking him if he intended to retire at age 62. (Pl. Brief at 8–9).

> We have long recognized and . . . [held] that a plaintiff may survive the defendant's motion for summary judgment in one of two ways. The first is by proof of "direct evidence" of discrimination. Direct evidence in this context is not the converse of circumstantial evidence, as many seem to assume. Rather, direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66

(8th Cir.1997). Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial. But if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext. *See, e. g., Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 971 (8th Cir. 1994).

*Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir.2004); *see Lee*, 432 F.3d at 849. Direct evidence "excludes 'stray remarks in the workplace', 'statements by nondecisionmakers,' and 'statements by decisionmakers unrelated to the decisional process itself.'" *EEOC*, 314 F.3d at 923 (quoting *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. 1775)(O'Connor, J., concurring). Direct evidence includes "evidence of actions or remarks of the employer that reflect a discriminatory attitude," *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir.1992)(quoting *Gray v. Univ. of Arkansas*, 883 F.2d 1394, 1398 (8th Cir.1989)). Additionally, "[c]omments which demonstrate a 'discriminatory animus in the decisional process' . . . or those uttered by individuals closely involved in employment decisions may constitute direct evidence. . . ." *Beshears*, 930 F.2d at 1354.

■■ Hansen's statement to Swift explaining the reason for the high health insurance costs and the inquiry to Underwood about his retirement plans can be relegated to the dustbin of stray remarks or remarks unrelated to the decisional process, indeed, remarks which in themselves

betray no age-based animus. Context robs the statement to Swift of any significance. Hansen was relaying the blunt reality of what he had been told was the reason for Monroe's high health insurance costs. As to the retirement questions, an employer may safely make reasonable inquiries of its employees about their retirement plans without exposing itself to liability for age discrimination. *Montgomery v. John Deere & Co.*, 169 F.3d 556, 560 (8th Cir.1999); *see also Lee*, 432 F.3d at 849.

■ Hansen's stated preference for younger workers is another matter. As Chief Judge Bennett of our sister court has written, the direct evidence inquiry boils down to the consideration of three criteria: "(1) the speaker; (2) the content; and (3) the causal connection between the comments and the adverse employment decision." *Nelson v. Long Lines, Ltd.*, 335 F.Supp.2d 944, 959 (N.D.Iowa 2004). The speaker should have a sufficient connection to the decisionmaking process. That is a disputed issue in this case, both Hansen and Coville say Coville effectively made the decision who between West and Underwood would be laid off. However, though Coville made the recommendation, Hansen, the principal owner of the company, approved it. The jury could reasonably find Hansen was the ultimate decisionmaker.

If Hansen was involved in the decisionmaking process, the content of the statement attributed to him by Bair must sufficiently evince a discriminatory attitude. *Beshears*, 930 F.2d at 1354; *Nelson*, 335 F.Supp.2d at 959 (citing *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1017 (8th Cir.1999)). Hansen's statement that he preferred younger over older workers accompanied by the disparaging remark about the capabilities of older workers compared to their younger counterparts could reasonably be viewed as reflecting a discriminatory attitude toward persons of Underwood's age in the workplace. *See Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449–50 (8th Cir.1993).

The close question is the sufficiency of the evidence to show the requisite causal link to the employment decision. Bair does not say when Hansen made the age preference statement and it clearly was not specifically made in relation to the decision about which production supervisor would be let go. At the same time, it was neither temporally remote from the course of events which led to the employment decision, nor unrelated to it so as to be easily set aside as a "stray" remark. The reduction in force decision was made within six months after Hansen acquired his interest in Monroe, a compressed time frame, and was always in prospect. The company was ailing. Costs needed to be cut if the company was to turn around from its decline. If Coville is believed, from the beginning, consistently and forcefully, Hansen pushed for a reduction in the workforce. The necessity of this became apparent after the company's poor showing at the February 2003 sales show. Thus regardless of when Hansen made the comment to Bair he made it against the backdrop of the need to cut costs and his strong desire to reduce the number of employees in order to do so.

In short order after the disappointing sales show the decision was made to eliminate one of the production supervisor positions as part of a reduction in force. The choice was between Underwood, age 61, or West, age 40. Hansen had the final say. In the circumstances in which the decisional process developed, the Court cannot say as a matter of law that the causal link is so tenuous that if the jury finds the statement attributed to Hansen by Bair was made and reflected a discriminatory attitude toward older workers, that attitude played no role in Hansen's approval of retaining West over Underwood.

There is substantial evidence that Underwood would have been let go regardless of any age-based animus Hansen may have held toward older workers. There is no evidence of a discriminatory attitude on Coville's part and that West was better suited to take over the combined supervisory position seems apparent. However, if there is sufficient evidence unlawful discrimination may have been a motivating factor in an employment decision, whether other legitimate reasons defeat plaintiff's claim is a trial issue not suitable for determination by summary judgment. *See Peterson v. Scott County,* 406 F.3d 515, 519 (8th Cir.2005); *Kratzer,* 398 F.3d at 1046; *Griffith,* 387 F.3d at 735.

As Underwood has produced direct evidence of age discrimination, it is not necessary to engage in the *McDonnell Douglas* analysis and the motion for summary judgment should be denied on the federal and state age claims.

## B. *ERISA*

In Count I of his complaint Underwood alleges that Monroe terminated his employment with the intent of interfering with his ERISA rights, specifically his health insurance benefits. Defendants argue this claim fails as a matter of law.

Section 510 of ERISA makes it unlawful for an employer to discharge a participant in an employee benefit plan "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." [12]

*Register v. Honeywell Fed. Mfg. & Tech., LLC,* 397 F.3d 1130, 1136 (8th Cir.2005)(quoting 29 U.S.C. § 1140); *see Kinkead v. Southwestern Bell Telephone*

*Co.,* 49 F.3d 454, 457 (8th Cir.1995). The *McDonnell Douglas* burden-shifting analysis applies in these cases. *Register,* 397 F.3d at 1137. To establish a *prima facie* case under § 510, a plaintiff must show that the employer had a specific intent to interfere with ERISA rights. *Id.; see also Regel v. K-Mart Corp.,* 190 F.3d 876, 880 (8th Cir.1999). In response to the *prima facie* case, the employer then has the burden of articulating a legitimate, nondiscriminatory reason for its conduct, which shifts the burden back to the plaintiff to show the reason is pretextual by presenting evidence regarding the employer's specific intent to interfere. *Regel,* 190 F.3d at 880. "This specific intent is present where the employee's (future or present) entitlement to protected benefits is a motivating factor in the employer's decision. . . . In other words, [plaintiff] ha[s] to show that he would not have been terminated had he not been entitled to benefits." *Koons v. Aventis Pharmaceuticals, Inc.,* 367 F.3d 768, 777 (8th Cir.2004). "[S]pecific intent can be shown with circumstantial evidence, but must be more specific than mere conjecture." *Regel,* 190 F.3d at 880 (quoting *Jefferson v. Vickers, Inc.,* 102 F.3d 960, 964 (8th Cir.1996)).

Underwood relies on the following facts to make out his ERISA claim:

(1) Hansen, after acquiring the financially troubled company, was intent on cutting costs. (Pl.App.77–78).

(2) The company's insurance agent told Hansen, when Hansen was trying to acquire insurance for the company, that the company had "bad demographics." (Pl.App. at 35, 60, 65).

(3) Hansen allegedly made comments at Monday morning meetings, in response to employee absences related to their health, like "Not again. It

---

12. There is no dispute that Underwood's health insurance benefit was afforded under an ERISA employee benefit plan.

makes the insurance go up." (Pl. App. at 90).

(4) Hansen allegedly mentioned keeping the number of insurance claims down. (Pl.App. at 71).

(5) When explaining the new health insurance program at a meeting with the employees in the fall of 2002, Hansen allegedly told them "if you don't like it, you know where the door is." (Pl.App. at 44).

(6) At the same meeting Hansen asked Underwood why he was not on his wife's health insurance. (Pl.App. at 91).

(7) Hansen asked Clarence Bair to hold off on proceeding with carpal tunnel surgery because it was a busy time of year. Bair had the surgery anyway. (Pl.App. at 1–2).

(8) Gary Phelps, an employee with muscular dystrophy, was one of the other employees laid off. (Pl.App. at 48).

(9) Shortly before the lay-offs were announced Underwood told Coville and Hansen he was going to have bladder surgery. Coville had known that Underwood had been having bladder problems for a while. (Pl. App. at 21, 89).

Defendants dispute whether some of the incidents (3, 4, 5 and 6) occurred. In the Court's judgment, if they did occur they, with the other facts noted, are neither direct evidence, nor do they support a reasonable inference, that Underwood was discharged with the specific intent of interfering with the receipt of his health insurance benefits. There is no evidence in the summary judgment record that terminating Underwood accomplished any substantial savings in Monroe's health insurance expenses. *See Clark v. Coats & Clark,*

*Inc.,* 990 F.2d 1217, 1224 (11th Cir.1993). Apparently Underwood's surgery was only going to keep him away from work for a day or two, as he told Hansen. Neither Hansen nor Coville reacted when Underwood informed them of the surgery. There is no indication Hansen and Coville discussed any health benefit savings that would be realized by terminating Underwood, or that his condition may have been a factor in driving up Monroe's health insurance costs similar to the evidence in *Hirsch v. National Mall & Service, Inc.,* 989 F.Supp. 977, 984 (N.D.Ill.1997), on which Underwood relies.

 Even assuming a *prima facie* case has been made, Underwood has not produced evidence sufficient to show that Monroe's articulated, legitimate non-discriminatory reasons for terminating his employment—a reduction in force and of the two production managers, West was more qualified to assume the combined supervisory position over the metal and wood areas—was a pretext.

There is no dispute that Monroe was in a difficult financial position, it had to find a way to cut costs to survive, Monroe's labor payroll was a significant expense, and Monroe really had no choice but to reduce the size of its workforce. (*See* Def. Stmt. of Facts ¶¶ 24–26, 51–52 and Pl. Resp.) Underwood has not identified evidence which calls into question the legitimacy of the decision to eliminate one of the two production supervisor positions as a part of the reduction in force. Nor has he identified any evidence that Coville's decision to recommend West over Underwood for the retained position was based on anything other than Coville's honest belief that West was more qualified for the combined supervisory duties because of West's experience in both the metal and wood areas. (*See id.* ¶¶ 36, 37 and Pl. Resp.)[13]

---

**13.** Underwood's denial of Coville's motive is not supported by reference to supporting evi-

Any specific intent to interfere with Underwood's ERISA rights could only have been held by Hansen. All of the evidence Underwood points to can be distilled to the facts that Hansen was concerned about health insurance costs and knew before Underwood was terminated (though not before the decision had been made) that he was scheduled to have bladder surgery. Concern over the cost of benefits and an employer's desire to keep them down are "not sufficient standing alone to prove the requisite intent by the path of pretext." *Regel,* 190 F.3d at 881 (quoting *Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231, 239 (4th Cir.1991)). Similarly, the mere fact Hansen learned of Underwood's need for surgery a few days before Underwood was told he would lose his job is not evidence that Hansen's specific intent in approving Coville's recommendation that Underwood be let go was to interfere with Underwood's health benefits, particularly in view of the undisputed evidence of the decisional process that led up to the selection of West over Underwood. The evidence Underwood relies on therefore does not pass beyond conjecture, nor is it sufficient to show that Monroe's legitimate reason for terminating Underwood's employment was a pretext to interfere with his health insurance benefits. Accordingly defendants' motion will be granted with respect to the ERISA claim in Count I of the Complaint.[14]

## IV.

## RULING AND ORDER

Defendants' motion for summary judgment is **granted in part and denied in part.** All counts of the Complaint are dismissed save the federal and state age discrimination claims in Counts II and III, which shall proceed to trial as previously ordered.

IT IS SO ORDERED.

---

dence in the summary judgment record. See footnote 1 *supra.*

**14.** Because the Court dismisses the ERISA claim, I have not addressed the issue of defendant Hansen's liability as an individual, if any, under ERISA nor whether there is any right to exemplary damages under ERISA.