**Mary KING, Appellant,**

v.

**Russell HARDESTY; Columbia Public School District, Appellees.**

No. 06–4163.

United States Court of Appeals, Eighth Circuit.

Submitted: Oct. 18, 2007.

Filed: Feb. 29, 2008.

Rehearing Denied April 10, 2008.

Karen K. Howard, argued, Kansas City, MO, for appellant.

Louis John Leonatti, argued, Mexico, MO, for appellee.

Before BYE, BOWMAN, and SMITH, Circuit Judges.

SMITH, Circuit Judge.

Mary Virginia King, a former employee of the Columbia Public School District ("the District"), filed suit against the District and Dr. Russell Hardesty, a school administrator within the District, alleging racial discrimination and retaliation, pursuant to 42 U.S.C. §§ 1981 and 1983.[1] The district court granted the defendants' motion for summary judgment on all counts. On appeal, King contends, among other things, that the district court granted summary judgment on grounds not asserted by the defendants. We affirm in part, reverse in part, and remand.

## I. Background

We review the facts in the light most favorable to King. *See Hughes v. Stottlemyre*, 454 F.3d 791, 793 (8th Cir.2006) (summary judgment standard). King, an African–American female with a bachelor's and master's degree in criminal justice, was hired by Hardesty, a Caucasian male, to work for the District during the summer of 2001. Hardesty hired King to, in essence, tutor a single homebound student, H.S., and she began doing so on July 1, 2001. The District paid King $19.30 per hour for this summer-only assignment.

On August 5, 2001, King applied with the District to be employed as a substitute

---

1. King also asserted a hostile environment claim, but she did not appeal the summary judgment of that claim.

teacher and homebound teacher. On August 27, 2001, Hardesty, the administrator at the Bearfield School,[2] asked King to accept a job as a "paraprofessional" at Bearfield, where she would continue working with H.S. one-on-one. King declined Hardesty's offer to work as a paraprofessional because the position only paid $7.00 per hour. King informed Hardesty, however, that she would accept the job as a substitute teacher, which paid $60.00 per day. The next day, Hardesty called King and asked her to report to Bearfield. King reiterated that she would only accept the job if she was hired as a substitute teacher, not as a paraprofessional. Hardesty told King to report to the school and that he would take care of the paperwork.

King began working at Bearfield on August 29, 2001, and she was paid at a rate of $60.00 per day—the normal pay rate for substitute teachers within the District. The District's policy in effect in 2001 provided that "Teachers continued in substitute employment for more than ten (10) consecutive days in any one full-time assignment shall be paid for all days at a rate based on the current teacher salary schedule." In early September 2001, after King had been working at Bearfield for 10 consecutive school days, Bobbie Pauley, the District's Director of Substitute Personnel, informed King that she had become a "long-term substitute." Pauley directed King to have Hardesty prepare the necessary paperwork so that Pauley could update King's records to reflect the increased pay rate. King asked Hardesty to prepare the proper paperwork, but Hardesty never did so, and King continued to be paid $60.00 per day rather than the higher "long-term substitute" rate.

Within three days of beginning her employment at Bearfield, Hardesty began making racial remarks to King. Among other things, King claims that Hardesty: (1) asked King if she had white in her blood because she was light-skinned; (2) told King that his family had been slaveholders; (3) told King that "white people teach black kids, African–American students, better than someone from their own race"; (4) asked King how she felt about the word "nigger" and used the word in King's presence; (5) asked King if she dated white males and said "once you go black, you never go back"; (6) told racial jokes in the office; (7) referred to African–American male employees as "big black bucks" and "my boys"; (8) referred to African–American students as "slaves," "crack babies," and "ghetto kids"; (9) used the words "ho" and "whore" to refer to female African–American students; and (10) made racially derogatory statements about the parents of African–American students. King was offended by Hardesty's comments and asked him, on multiple occasions, to refrain from making such comments, but Hardesty would respond: "I can run this school any way I want to"; "no one questions my actions because I am the administrator"; or "I can run [Bearfield] any damn way I please."

King contends that she reported Hardesty's offensive conduct to Pauley, but Pauley referred King to Mary Laffey, the District's Assistant Superintendent of Human Resources. King asserts that she attempted to speak to Laffey, a Caucasian female, at least a dozen times to report the perceived racial discrimination, but each time she went to Laffey's office King was told that Laffey was too busy to speak to her. When King attempted to call Laffey,

**2.** The Bearfield School is a small, specialized school within the District for students with behavioral problems that prevent them from functioning in a normal classroom. Bearfield seeks to reintegrate its students into regular classroom settings.

she was told she should email her instead. King, however, did not have computer access at the school.

On December 7, 2001, King was terminated from her employment at Bearfield, and H.S., the student King had been teaching, was subsequently placed into Cynthia Ryan's classroom; Ryan is a Caucasian teacher at Bearfield. The District and Hardesty contend that King was terminated because H.S., due to King's successful teaching, no longer needed individual instruction and was able to move into a classroom setting. King claims that her firing was discriminatory and retaliatory because of her complaints about Hardesty and the District.

Prior to her termination, and pursuant to her earlier application, King had also been assigned 25 hours of homebound instruction during the fall of 2001. King requested additional hours but was told there were not any available. It is undisputed that Hardesty was the decisionmaker for homebound instruction hours during the 2001–02 school year. After King's termination from Bearfield on December 7, 2001, she was not assigned any additional homebound instruction hours. King asserts that she continued to request homebound instruction assignments through 2005, but she was never assigned any homebound instruction hours after her December 7, 2001 termination.

In February 2002, King reported Hardesty's racially discriminatory conduct to Laffey. During this same conversation, King asked Laffey to consider her for a fellowship opportunity through Columbia College; Columbia College offered fellowship opportunities for teachers whom the District planned to hire. But Laffey informed King that the District had no intention of hiring her.

King also applied with the District each year to be a substitute teacher. Although King was qualified and certified as a substitute, she alleges that she was not called to substitute as frequently as some other Caucasian substitute teachers. The District required prospective substitute teachers to be on the District's substitute teachers list if they wished to be called. King had been on the list in the Spring of 2002 and during the 2002–03 school year, but she was omitted from the District's list when the 2003–04 school year began. The District asserts that it left King off of the substitute list because of multiple complaints received about her conduct while substitute teaching, which resulted in seven schools excluding King from further substitute teaching at their facilities. After speaking with various District officials about being "blackballed," King met with Laffey on September 3, 2003. Following this meeting, Laffey restored King to the substitute teachers' list for elementary schools only. Laffey's notes from this meeting stated that King was "aggressive, assertive," and stated that "if any exclusions, we are done." King claims that she was assigned fewer substitute teaching assignments than Caucasian substitutes after Laffey reinstated her to the substitute list. King remained certified as a substitute teacher and continued to apply to substitute through the 2005–06 school year. She also applied to become one of the District's home-school communicators, but she was never hired for the position.

In the spring of 2002, King reported to Beulah Ralph, the District's supervisor of home school communicators, about how African–American employees were discriminated against at Bearfield. According to King, Ralph, an African–American female, replied that "it was nothing new, [and] that she's heard it all." In May 2002, Ralph asked King to work for a week at a middle school within the District because the school's home-school communicator was re-

tiring, and Ralph was considering King for the position. King worked at the school for the week, and afterward, Ralph told her that she was pleased with King's performance and would be recommending that King be the school's next home-school communicator.

During the 2002–03 school year, home-school communicator positions became available at several of the District's schools. King met the District's stated qualifications and applied for the positions, but was not selected. King asked Ralph about the rejections. According to King, Ralph said Laffey was upset with King because King had been speaking out against the District. Laffey allegedly told Ralph that she would never hire King as a permanent employee. Ralph then told King that the hiring decisions were out of her hands because Laffey made the final decisions. As proof of Laffey's retaliatory motive, King presented a copy of a note typed by Pauley in March of 2002, that stated: "Talked w/ Laffey and she said to deep-six [King] and to talk w/ Beulah [Ralph]. Beulah will not use [King] again. She said she would not be hiring [King]." King also contends that she was not hired for seven other home school positions that became available in subsequent school years.

In July 2005, King commenced this action against the District and Hardesty. In Counts I and III, King asserted claims against the District for race discrimination and retaliation, respectively, pursuant to 42 U.S.C. § 1981.[3] In Count IV, King asserted an equal protection claim against both the District and Hardesty for race discrimination and retaliation, pursuant to

42 U.S.C. § 1983. King claimed that the District racially discriminated against her when it: (1) failed to pay her the salary of a long-term substitute teacher; (2) terminated her as a substitute teacher at Bearfield; (3) denied her homebound instructor assignments; (4) denied her substitute teaching assignments from the spring of 2002 through October 31, 2005; and (5) did not hire her to fill openings in the District's home school communicator positions. According to King, the District, using these adverse employment actions and the district's denial of fellowship opportunities, retaliated against her for reporting her claims of discrimination. King's claims against Hardesty arose from her termination from Bearfield and the denial of homebound instructor assignments.

The District and Hardesty jointly moved for summary judgment, and the district court granted the motion in favor of the defendants on all counts. King appeals the district court's summary judgment.

## II. *Discussion*

"We review the district court's grant of summary judgment de novo." *Hughes,* 454 F.3d at 796. A moving party is entitled to summary judgment when the evidence, viewed in the light most favorable to the nonmoving party, establishes that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *Id.*

### A. *Race Discrimination Claims*

 King brought race-discrimination claims against the District pursuant to 42 U.S.C. §§ 1981[4] and 1983 and against

---

3. King did not appeal Count II of her complaint.

4. "Section 1981, as amended by the Civil Rights Act of 1991, provides a cause of action

for discrimination in the employment relationship." *Bogren v. Minnesota,* 236 F.3d 399, 408 (8th Cir.2000); *see* 42 U.S.C. § 1981(a), (b).

Hardesty pursuant to § 1983. To prevail under either claim, King must demonstrate intentional discrimination. *Snelling v. St. Louis County Hous. Auth.,* 960 F.2d 1053, 1992 WL 74594, *1 (8th Cir.1992) (unpublished per curiam) (citing *Williams v. City of Sioux Falls,* 846 F.2d 509, 510–11 (8th Cir.1988) (stating that claims brought pursuant to §§ 1981 and 1983 require proof of intentional discrimination)). Intentional discrimination may be shown by direct or indirect evidence. *Griffith v. City of Des Moines,* 387 F.3d 733, 736 (8th Cir.2004).

■■■ "Although summary judgment is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim." *Arnold v. Nursing and Rehabilitation Center at Good Shepherd, LLC,* 471 F.3d 843, 846 (8th Cir.2006) (citation omitted). To successfully parry the defendants' motion for summary judgment, King must put forth either (1) proof of "direct evidence" of discrimination; or (2) a prima facie case of unlawful discrimination through circumstantial evidence under the *McDonnell Douglas* burden-shifting test, and then rebutting any proffered nondiscriminatory reasons for the employment decision with sufficient evidence of pretext. *Griffith,* 387 F.3d at 736.

■■■ When relying on direct evidence to avoid summary judgment, the plaintiff must provide evidence:

showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated[ ] the adverse employment action. Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal

discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial.

*Griffith,* 387 F.3d at 736 (citation and punctuation omitted).

■■■ But, if King "lacks evidence that clearly points to the presence of an illegal motive, [s]he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Id.* Under the *McDonnell Douglas* analysis:

> the burden of persuasion never leaves the plaintiff, but there is a shift in the burden to come forward with evidence: (1) the plaintiff must present a prima facie case consisting of four distinct elements; (2) the defendant must rebut the prima facie case by showing non-discriminatory reasons for termination; and (3) the plaintiff must show the reasons are pretextual.

*Stacks v. Southwestern Bell Yellow Pages, Inc.,* 996 F.2d 200, 202 (8th Cir.1993).

### 1. Direct Evidence

■■■ Under the mixed-motives test established in *Price Waterhouse,* "[i]f there is direct evidence of [race] discrimination, the burden rests with the employer to show that it more likely than not would have made the same decision without consideration of the illegitimate factor." *Kratzer v. Rockwell Collins, Inc.,* 398 F.3d 1040, 1046 (8th Cir.2005) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). King "may proceed under [the] *Price Waterhouse* [approach] if she produces direct evidence of conduct or statements by persons involved in the decision-making process, which indicate a discriminatory atti-

tude was more likely than not a motivating factor in the employer's decision." *Kratzer*, 398 F.3d at 1045–46 (citing *Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. 1775). "At the summary judgment stage, the issue is whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment action. If so, the presence of additional legitimate motives will not entitle the defendant[s] to summary judgment." *Griffith*, 387 F.3d at 735 (emphasis in original). "Therefore, evidence of additional motives, and the question whether the presence of mixed motives defeats all or some part of plaintiff's claim, are trial issues, not summary judgment issues." *Id.; see also Kratzer*, 398 F.3d at 1046 ("Evidence of the employer's motives for the action, and whether the presence of ... mixed motives defeats the plaintiff's claim, is a trial issue, not intended for summary judgment").

■■■ King contends that Hardesty, who was a decisionmaker in her termination from Bearfield and her nonassignment of homebound instruction hours,[5] made racially discriminatory comments to her that constitute direct evidence of race discrimination.[6] The district court acknowledged that Hardesty had made offensive racial remarks to King, but concluded that nothing in the record created an inference that Hardesty's racial animus motivated any adverse employment action suffered by King. Thus, the district court did not ana-

lyze King's claims under the *Price Waterhouse* approach but under the *McDonnell Douglas* approach.

*Price Waterhouse* defined the term "direct evidence" negatively to exclude "stray remarks in the workplace," "statements by nondecisionmakers," or "statements by decisionmakers unrelated to the decisional process itself." *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring). We have held that direct evidence within the meaning of *Price Waterhouse* may include "evidence of actions or remarks of the employer that reflect a discriminatory attitude," "comments which demonstrate a discriminatory animus in the decisional process," or comments "uttered by individuals closely involved in employment decisions." *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir.1991) (internal quotations and citations omitted). Given these benchmarks, we hold that the district court erred in finding that King had not provided any direct evidence of discrimination and by not analyzing King's termination and nonassignment of homebound instruction claims under the *Price Waterhouse* approach.

Many of Hardesty's alleged racial comments fall into the "stray remarks" or "statements by decisionmakers unrelated to the decisional process" categories of comments that are insufficient for a finding of direct evidence;[7] however, we conclude that Hardesty's statement to King—

---

**5.** King did not show that Hardesty was a decisionmaker in her other alleged adverse employment actions.

**6.** Although Hardesty denies making any of the alleged discriminatory statements, we are obliged to view the evidence in the light most favorable to King, the nonmoving party. *Mershon v. St. Louis University*, 442 F.3d 1069, 1075 (8th Cir.2006). Thus, at this juncture, we must accept as fact that Hardesty made the alleged statements. *Id.*

**7.** *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring); *Browning v. President Riverboat Casino–Missouri, Inc.*, 139 F.3d 631, 635 (8th Cir.1998) ("Not all comments that reflect a discriminatory attitude will support an inference that an illegitimate criterion was a motivating factor in an employment decision.") (citation omitted).

an African–American teacher—that "white people teach black kids ... better than someone from their own race," is evidence that may be viewed as directly reflecting Hardesty's alleged discriminatory attitude. With such evidence, the factfinder could find that a discriminatory attitude was more likely than not a motivating factor in Hardesty's decisions because Hardesty may believe white teachers on the basis of their race would do a better job than King, an African–American. *See Browning v. President Riverboat Casino–Missouri, Inc.*, 139 F.3d 631, 635 (8th Cir.1998) (holding that supervisor's "reference to [plaintiff] as 'that white boy' in context of [plaintiff's] employment warrant[ed] an inference of discriminatory attitude sufficient to permit the factfinder to conclude that race was a motivating factor in the subsequent decision to terminate [plaintiff]").[8] Following King's termination, her former student was placed into a white teacher's classroom. Hardesty's "white people teach black kids better" comment revealed "a decidedly negative attitude toward [African–American] people on the part of [a person] responsible for [the employment decision]." *Browning,* 139 F.3d at 635 (quoting *Alton Packaging Corp.,* 901 F.2d at 924 n. 6); *see also Beshears,* 930 F.2d at 1354 ("direct evidence may include evidence of actions or remarks of the employer that reflect a discriminatory attitude.") (alteration omitted).

Therefore, we conclude that the district court erred in finding that King had not adduced direct evidence that race was *a*

motivating factor in Hardesty's decision to terminate her from Bearfield and not assign her homebound instructions hours. We reverse the summary judgment on those claims and remand them for further proceedings because "evidence of additional motives, and the question whether the presence of mixed motives defeats all or some part of plaintiff's claim, are trial issues, not summary judgment issues." *Griffith,* 387 F.3d at 735; *see also Kratzer,* 398 F.3d at 1046 ("Evidence of the employer's motives for the action, and whether the presence of ... mixed motives defeats the plaintiff's claim, is a trial issue, not intended for summary judgment.").

King did not produce direct evidence for her remaining discrimination claims: the District's failure to pay her the long-term substitute rate, failure to assign her substitute teaching assignments, and failure to hire her as a home school communicator. She also did not establish that Hardesty was a decisionmaker or that he was involved in the decisionmaking processes relating to these claims. Thus, King failed to establish any direct evidence in support of those claims, and the district court was correct to analyze these remaining claims under the *McDonnell Douglas* framework. *See Griffith,* 387 F.3d at 736 (stating that in the absence of direct evidence, a plaintiff can defeat summary judgment by establishing an inference of discrimination through circumstantial evidence and then rebut the employer's nondiscriminatory reasons as pretextual, under the three-part

---

**8.** *See also Stacks v. Southwestern Bell Yellow Pages, Inc.,* 27 F.3d 1316, 1324 (8th Cir.1994) (holding that supervisor's comment that "women were the worst thing that had happened to this company" was direct evidence that an illegitimate criteria (gender) was a motivating factor in company's adverse employment action against plaintiff, even though the statement was not made during the decisional process); *EEOC v. Alton Packaging*

*Corp.,* 901 F.2d 920, 924 (11th Cir.1990) (holding manager's statement that "if it were his company he would not hire blacks" was direct evidence of discrimination in plaintiff's failure to promote claim; statement indicated "a decidedly negative attitude toward black people" on the part of a decisionmaker and there was "no reason to think [his] attitude[ ] differ[ed] from hiring to promotion").

burden-shifting test established in *McDonnell Douglas*).

## 2. *McDonnell Douglas Analysis*

The district court evaluated each of King's discrimination claims under the *McDonnell Douglas* burden-shifting test and ruled that King had either failed to establish her prima facie case or that she failed to show that the defendants' stated reasons for their actions were pretextual. King challenges the district court's conclusions and asserts that she established both a prima facie case and that the Defendant's nondiscriminatory reasons were pretextual with respect to each of her claims. Additionally, King contends that the district court, in its *McDonnell Douglas* analysis, erroneously granted summary judgment sua sponte on grounds not raised by the defendants.

### a. *Sua Sponte Grounds for Summary Judgment*

King asserts that the defendants, in their summary judgment motion, only argued that they acted on the basis of legitimate nondiscriminatory reasons and did not challenge whether King had made a prima facie case of discrimination. Accordingly, King contends that the district court should have limited its analysis to the issues raised in the summary judgment motion. "We have repeatedly held that in the Eighth Circuit, a district court commits reversible error when it grants summary judgment on an issue not raised or discussed by the parties." *Heisler v. Metropolitan Council*, 339 F.3d 622, 631 (8th Cir.2003). Summary judgment should not be granted against a party on an issue that

they have not been given opportunity to respond. We, therefore, examine the district court's reasons for granting summary judgment on King's remaining claims[9] to determine whether the court did so on grounds not raised by the defendants.

The defendants' motion and memorandum in support of summary judgment did not specifically address King's claim regarding long-term substitute pay. The affidavit of Laffey, the District's Assistant Superintendent of Human Resources, however, was filed in support of the motion for summary judgment and referenced in the defendants' memorandum in support of the motion. In her affidavit, Laffey averred that the District's policy for paying "teachers" who substitute for more than ten consecutive days on any one assignment at the long-term substitute rate only applied to certified teachers, not certified substitute teachers. Because King was only certified as a substitute teacher, Laffey asserted that the policy for paying long-term substitutes a higher rate did not apply to King. Further, Laffey's affidavit stated that although the District had agreed to pay King at the rate of a substitute teacher, her employment with the District was classified as that of a "temporary substitute paraprofessional." Attached to Laffey's affidavit was a memo from Laffey to King, dated September 6, 2001—prior to King's 10th consecutive day teaching at Bearfield—that clarified that King was employed by the District as a temporary substitute paraprofessional, not a teacher, and stated that "[p]araprofessionals who work for more than 10 days in a row remain at the hourly wage. You are not employed in

---

9. As discussed above, King also alleged racial discrimination in her termination from Bearfield and her nonassignment of homebound instructor hours, but because we concluded that summary judgment should be reversed on those claims as they were supported by direct evidence, we need not discuss them here. We note, however, that the district court relied upon the "same-actor inference" in granting summary judgment on those two claims, which was not an issue raised by the defendants.

a teaching position but we have agreed to pay you the teacher sub wage ($60.00) versus the para wage ($52.43) for each day." In another memo from Laffey to King dated December 7, 2001, which was also attached to Laffey's affidavit, Laffey clarified to King that "your temporary employment with the [District] was as a para professional and not as a teacher."

█ The district court, apparently relying on Laffey's affidavit and the attachments thereto, concluded that King's claim failed because she had not shown that she was qualified for the pay increase as the District's policy only applied to certified teachers. King was not a certified teacher, but a certified substitute teacher. The defendants did not raise King's ineligibility in the text of their motion for summary judgment or the memorandum in support of the motion. But, the affidavits incorporated in defendants' motion addressed King's nonqualification for the long-term substitute pay. The affidavits thus provided King adequate notice and an opportunity to respond to the argument that she had failed to establish that element of her prima facie case. *See Demerath Land Co. v. Sparr,* 48 F.3d 353, 356 (8th Cir.1995) (finding district court did not grant summary judgment sua sponte where issue was raised in movant's brief in support of motion, and thus summary judgment was proper as nonmovant had opportunity to respond but offered no evidence that a genuine factual dispute existed on the claim); *see also* Fed.R.Civ.P. 56(c) ("The [summary] judgment sought should be rendered if the pleadings, the discovery and disclosure material on file, *and any affidavits* show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.") (emphasis added). Therefore, the district court's grant of summary judgment on this issue was not sua sponte.

### i. *District's Refusal to Pay King the Long–Term*

### *Substitute Teacher Salary*

The District's policy on compensation for substitute teachers provides that substitutes are entitled to an increased rate of pay once the "teachers" have "continued in substitute employment for more than ten (10) consecutive days in any one full-time assignment." *See* District policy GCE–C.C93. King contends that she began working as a substitute teacher at Bearfield on August 29, 2001, and continued working in that substitute role until December 7, 2001, but that she did not receive the pay rate increase from the substitute rate to the higher "long-term sub" pay rate because of her race.

█ King contends that she was entitled to be paid at the long-term substitute rate because Bobbie Pauley, the District's Director of Substitute Personnel, told her on September 12, 2001, that King had become a long-term substitute and was thus entitled to the long-term substitute pay rate. In support of this contention, King provided a copy of the District's 2001–02 pay schedule on which King had written "Long–Term As of 9–12–01 Per Bobbie Pauley."

Notwithstanding Pauley's statement, the district court granted summary judgment finding that there was no genuine issue of material fact as to King's qualification because King had provided no evidence that the District's interpretation of the policy was incorrect or that Pauley had authority to override the District's policy. We disagree with the district court's assessment.

Our review of the record shows two different versions of the District's "Substitute Professional Staff Employment" policy. This policy contains the long-term

substitute pay provision. King relies on policy GCE–C.C93 (10/99), which states:

Teachers continued in substitute employment for more than ten (10) consecutive days in any one full-time assignment shall be paid for all days at a rate based on the current teacher salary schedule. *Placement on the salary schedule shall be determined by the director of personnel,* using guidelines established for placement of regular teachers.

(emphasis added).

In contrast, policy GCE–C.C93 (12/03) states:

Teachers continued in substitute employment for more than ten (10) consecutive days in any one (1) full-time assignment shall be paid for all days at the district's long-term substitute rate. *Placement on the salary schedule shall be determined by the Assistant Superintendent for Human Resources,* using guidelines established for placement of regular teachers.

(emphasis added).

Depending on which policy governs, either the director of personnel—Pauley—or the assistant superintendent for human resources—Laffey—had the authority to determine whether King was entitled to receive the long-term substitute pay rate. According to King, after she had worked for the District more than ten consecutive days as a substitute at Bearfield, Pauley informed her on September 12, 2001, that she was entitled to receive the long-term substitute pay rate. Under policy GCE–C.C93 (10/99), Pauley, as the Director of Substitute Personnel, was the person within the District who had authority to make that determination. In its summary judgment motion, the District relied upon Dr. Laffey's interpretation of the long-term substitute policy and Dr. Laffey's belief that King was not entitled to the increased pay rate, under GCE–C.C93 (10/99); however, Pauley, not Laffey, had the authority to make that determination.

King's disparate pay claim turns upon the District's compensation policy for long-term substitutes. Viewing the evidence in the light most favorable to King, we must accept the GCE–C.C93 (10/99) version of the policy as the policy in effect in 2001, which is the applicable time period for this claim. Under this policy, Pauley had authority to determine if King was to be paid the long-term substitute rate. Thus, King's contention that Pauley informed her that she was entitled to the increased rate, along with King's documentary evidence supporting her claim, create a genuine issue of material fact precluding summary judgment on this claim.

ii. *Denial of Substitute Teaching Assignments*

King contends that the District discriminated against her on the basis of race by (1) excluding her from the District's substitute teacher list for the 2003–04 school year, and (2) by not hiring her for substitute teaching assignments with the same frequency as white substitutes after she was placed back on the list.

In moving for summary judgment on these claims, the District did not challenge King's prima facie case. Rather, it argued that it had a legitimate, nondiscriminatory reason for omitting her from the substitute list and for not assigning her as many substitute assignments as others. The District contended that it temporarily removed King from the substitute teacher list and limited her substitute assignments once she was returned to the list because her misconduct while working as a substitute for the District had resulted in numerous complaints. These complaints led seven schools within the District to exclude

King from substitute teaching at their schools.

To rebut the District's nondiscriminatory reason for removing her from the substitute list, King asserted that Caucasian substitute teachers had been kept on the District's substitute list even though they had been excluded from as many or more schools than King. The district court granted summary judgment in favor of the District on King's claim regarding her omission from the substitute list, concluding that King had not shown that the Caucasian substitutes were similarly situated to her because she had not demonstrated that the nature of the complaints against them were similar to the complaints against her. Thus, the district court ruled that King did not establish that the District's reason for excluding her from the list was pretext for race discrimination.

■■■■■ Instances of disparate treatment can support a claim of pretext, but King has the burden of proving that she and the disparately treated Caucasian substitute teachers were "similarly situated in all relevant respects." *Harvey v. Anheuser–Busch, Inc.,* 38 F.3d 968, 972 (8th Cir. 1994) (internal quotations and citations omitted). "Employees are similarly situated when they are involved in or accused of the *same offense* and are disciplined in different ways." *Wheeler v. Aventis Pharmaceuticals,* 360 F.3d 853, 858 (8th Cir. 2004) (quoting *Harvey,* 38 F.3d at 972) (emphasis added in *Wheeler).* This is a rigorous test to meet. *Harvey,* 38 F.3d at 972; *Wheeler,* 360 F.3d at 858.

■■■■ Based upon the instant record, we hold that King did not meet her burden of proving that she was similarly situated to the disparately treated Caucasian substitute teachers because she did not establish that they were accused of the same offenses. Although each substitute's conduct resulted in various schools excluding them from substituting at those schools in the future, King provided no proof that the conduct resulting in the respective exclusions was sufficiently similar. As the individual schools within the District made the determinations to exclude the substitutes based on their conduct or performance at those schools, the District could properly evaluate the schools' reasons behind each substitute's exclusions and discipline those teachers accordingly based on the reasons behind the exclusions. *See Harvey,* 38 F.3d at 972 (ruling that disparity in discipline was warranted where the employees were not similarly situated). Without showing that their conduct was the same, King cannot establish that she was similarly situated to the Caucasian teachers with exclusions or that the District's reasons for omitting her from the list were pretext. We, therefore, affirm the district court's summary judgment on this claim, and reiterate that "the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 781 (8th Cir.1995).

■■■■ The district court also granted summary judgment on King's claim that the District discriminated against her by assigning her fewer substitute teacher assignments than Caucasians once she was placed back on the list, ruling that King had not established a prima facie case of discrimination because she did not establish an inference that she was denied assignments due to her race. King notes that the District never asserted in its motion for summary judgment that King had failed to make her prima facie case on this claim; rather, it assumed that she had

established her prima facie case and sought summary judgment based only upon its legitimate, nondiscriminatory reasons. Thus, the district court used an improper sua sponte ground for granting summary judgment on this claim. *See Heisler*, 339 F.3d at 631 ("We have repeatedly held that in the Eighth Circuit, a district court commits reversible error when it grants summary judgment on an issue not raised or discussed by the parties").[10] Accordingly, we reverse the grant of summary judgment of this claim.

### iii. *Nonselection for Home School Communicator Positions*

King asserts that the District unlawfully discriminated against her on the basis of her race when it failed to hire her as a home school communicator, despite her being qualified for the openings and applying for the positions. The District had home school communicator position openings at various schools during the 2002–03, 2003–04, and 2004–05 school years and hired others to fill those positions. The District, in moving for summary judgment, only addressed one of the openings—an opening at Lange Middle School—stating that King was not hired for that particular opening because she had been excluded from substitute teaching at Lange. Further, the District asserted that the opening at Lange was filled by a qualified African–American female.

The district court found the District's reasons for not hiring King as the home school communicator at Lange nondiscriminatory. However, the district court failed to address King's discrimination claim as it related to any of the other home-school communicator positions. Further, the court only addressed King's claim regarding her nonselection for home school communicator positions under the retaliation framework. Because of the district court's oversight, we remand for consideration of this discrimination claim.

### B. *Retaliation Claims*

■■■ King also brought claims for retaliation against the District, pursuant to 42 U.S.C. §§ 1981 and 1983, and against Hardesty pursuant to § 1983. To establish a prima facie case of retaliation, King must show that she "engaged in statutorily protected activity," that the District "took adverse employment action against h[er]," and that "there is a causal connection between the two events." *McClure v. Career Systems Development Corp.*, 447 F.3d 1133, 1137 (8th Cir.2006).

■■■ King claims she was retaliated against by the District for her reports of discrimination within the District. A complaint of race discrimination to supervisors is protected activity. *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 758 (7th Cir.2006). King alleged that she suffered six adverse employment actions in retaliation for her complaints. Five of these alleged adverse actions are the same as

---

**10.** *See also Hughes*, 454 F.3d at 800 (reversing summary judgment where district court found legitimate nondiscriminatory reasons for defendants' actions, but defendants had only argued against plaintiff's prima facie case, stating that plaintiff "should not have been required to anticipate the district court would grant summary judgment on a basis defendants admit was not raised"); *Am. Red Cross v. Cmty. Blood Ctr. of the Ozarks*, 257 F.3d 859, 863 (8th Cir.2001) (reversing summary judgment on three issues not raised in the moving party's motion); *Walker v. Mo. Dep't of Corr.*, 138 F.3d 740, 742 (8th Cir. 1998) (reversing summary judgment on ADA claim where district court based its decision on plaintiff's failure to establish an adverse employment action and the defendants' summary judgment submissions only discussed whether plaintiff was a qualified individual with a disability).

those relied upon in her discrimination claims, that: (1) she was not paid the salary of a long-term substitute teacher; (2) she was terminated from her position as a substitute teacher at Bearfield; (3) she was denied homebound instructor assignments; (4) she was denied substitute teacher assignments; and (5) she was not hired as a home school communicator. The additional adverse employment action alleged by King in her retaliation claims was that she was denied fellowship opportunities by the District.

In the District's motion for summary judgment on the retaliation claims, the District, as it had done on the discrimination claims, did not challenge King's prima facie case, but asserted that it had legitimate, nondiscriminatory reasons for each of the first five adverse employment actions listed above, which King could not show were pretextual. As to King's claim regarding the denial of fellowship opportunities, the District made no mention of the claim anywhere in its motion for summary judgment, memorandum in support of the motion, or any affidavit filed with the memorandum in support. Therefore, it was improper for the district court to grant summary judgment on this claim, and we will reverse. *See Heisler*, 339 F.3d at 631 ("We have repeatedly held that in the Eighth Circuit, a district court commits reversible error when it grants summary judgment on an issue not raised or discussed by the parties"). As for King's other retaliation claims, we will address them in turn.

### 1. *Denial of Home School Communicator Positions*

King claims that the District retaliated against her by not hiring her for various home school communicator positions that opened within the District during the 2002–03, 2003–04, and 2004–05 school years. Assuming that King met her prima facie case, the District only proffered a legitimate, nondiscriminatory reason as to one of those positions—an opening at Lange Middle School. The District's proffered reason for not hiring King as the home school communicator at Lange was because King had previously been excluded from substitute teaching at Lange. Because King has not rebutted this legitimate reason as pretext, her claim regarding the home school communicator at Lange must fail. Nevertheless, because the District did not proffer any reasons for not hiring King for the other home school communicator position openings during the 2002–05 school years—which we assume King applied for as there has been no challenge to her prima facie case—the district court erred in granting summary judgment as to those claims. By not challenging King's prima facie case and not providing any reasons for not hiring King for the other home communicator positions, there is no basis for granting the District summary judgment. *Id.*

### 2. *Denial of Substitute Teaching Assignments*

On King's claim that the District retaliated against her by omitting her from the substitute teacher list and limiting her substitute teaching assignments, the district court found that King had failed to prove her prima facie case—an argument that was not raised by the defendants. However, the district court alternatively ruled that even if King had proved her prima facie case, her claim failed because she did not show that the District's reasons were pretextual. On this latter reason, we agree.

The District proffered that they excluded King from the list and limited her substitute teaching assignments because of

King's prior misconduct during previous substitute teaching assignments, which led to seven schools excluding her from substitute teaching at their facility. King attempted to rebut the District's reasons as pretext, by providing evidence that Laffey wrote in her notes, after a September 4, 2003, meeting with King, that King was "aggressive, assertive" and "if any exclusions, we are done." On September 5, 2003, Pauley wrote that "[Laffey] talked with [King] and told me to give her a chance in elementary schools and the first time I receive a complaint she's out. I am not to use her again." These comments do not show pretext; rather they are consistent with the District's position that it omitted King from its substitute list for prior misconduct, then following a meeting between Laffey and King, Laffey agreed to give King a second chance at substituting at the elementary level only. Accordingly, we affirm the summary judgment of King's substitute teaching retaliation claim.

### 3. *Denial of Homebound Instruction Assignments*

King contends that the defendants retaliated against her by denying her homebound instruction assignments after she was terminated from Bearfield. Although King provided direct evidence of discrimination regarding the denial of homebound instruction assignments, she has not provided any direct evidence of retaliation regarding this claim. Thus, the district court correctly analyzed the claim under the *McDonnell Douglas* burden shifting approach. *See Carrington v. City of Des Moines, Iowa*, 481 F.3d 1046, 1050 (8th Cir.2007) ("In the absence of direct evidence, the burden-shifting framework of *McDonnell Douglas* ... governs retaliation claims.") (internal citation omitted).

 For purposes of their summary judgment motion, the defendants assumed that King had established her prima facie case, but proffered legitimate, nondiscriminatory reasons for denying King homebound instruction assignments. The defendants asserted that since June 2000 the District's policy required an individual seeking homebound teaching assignments to submit a homebound teaching application every year, and King had not submitted such application after the 2001–02 school year. Further, the defendants asserted that the District policy was to give homebound instruction assignment priority to the student's classroom teacher first, then to a teacher with a bachelor's degree in education, then to an individual with a bachelor's degree or greater. King failed to rebut these reasons as pretextual, and we affirm the district court's summary judgment of this claim.

### 4. *Remaining Claims*

On King's remaining retaliation claims against the District—failure to pay the long-term substitute rate and her termination from Bearfield—the district court granted summary judgment in favor of the District, relying on its reasoning and analysis of those claims under King's discrimination causes of action. Because we find that the district court's reasoning on those discrimination claims was flawed, however, we must also reverse the retaliation claims relying upon that flawed reasoning.

Lastly, King asserted § 1983 equal protection claims against the District and Hardesty, in both his official and individual capacity. The district court granted summary judgment on these claims "to the same extent it ha[d] granted it on King's other claims." Because we reversed the summary judgment on King's "other claims" we must also reverse summary judgment here.

### III. *Conclusion*

Accordingly, we affirm in part, reverse in part, and remand for further proceedings.